[No. S040471. May 17, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
MILTON RAY POLLOCK, Defendant and Appellant.

**COUNSEL**

Carl Gonser and Michael B. McPartland, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Linda M. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—Defendant Milton Ray Pollock appeals from a judgment of death upon his conviction by jury verdict of two counts of murder in the first degree (Pen. Code, § 187),[1] with the special circumstances of murder in the commission of robbery (§ 190.2, subd. (a)(17)(A)), murder in the commission of burglary (*id.*, subd. (a)(17)(G)) and multiple murder (*id.*, subd. (a)(3)). The jury further found that defendant personally used a knife to commit both murders. (§ 12022, subd. (b).) The jury that returned these verdicts as to guilt and special circumstances also returned a penalty verdict of death for these offenses. The trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)) and sentenced defendant to death.

This appeal from the judgment of death is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

### I. FACTS AND PROCEEDINGS

In September 1989, Earl Garcia and Doris Garcia, an elderly married couple, were stabbed to death in their home in Castro Valley. At trial, the prosecution presented evidence, accepted by the jury, that defendant killed them during a burglary and robbery to obtain money with which to buy crack cocaine.

#### A. *Prosecution's Guilt Phase Case-in-chief*

In August 1989, Earl and Doris Garcia hired David Souza to install a sprinkler system in the yard of their home on Palomares Canyon Road in Castro Valley. In turn, Souza hired Lloyd Sawyer and defendant to help him perform the job over the Labor Day weekend, September 2 through 4. Sawyer was to work all three days, and defendant only on Sunday and Monday. Sawyer had worked for Souza for four or five years. Defendant had not worked for Souza before, but Souza knew defendant because they had lived for many years in the same neighborhood in Hayward, and another resident of that neighborhood had recommended defendant to Souza. At defendant's request, Souza loaned defendant $20 as an advance on his salary.

On Saturday, September 2, Souza and Sawyer worked by themselves at the Garcias' property, digging trenches for the sprinkler pipes. On Sunday, September 3, Souza picked up defendant at the home where defendant lived with his mother and his brother, Ted Pollock, and they drove to the Garcias' property, arriving around 9:00 a.m. Sawyer met them there, and the three of

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

them set to work. Souza and Sawyer thought defendant seemed "normal"; he did not appear to be under the influence of drugs or alcohol. After working for four hours, defendant told Souza he had a prior commitment, and he asked Souza to drive him home. Souza paid defendant approximately $20 for the work he had done that day and then drove him to his home. Souza returned to the Garcias' property and continued to work with Sawyer on installing the sprinkler system. Defendant appeared at the Garcias' property around 3:00 p.m., asking Garcia if he could "borrow a little money to get him through the evening." Souza and Sawyer together gave defendant around $10, and defendant left.

On Monday, September 4, 1989, defendant's mother drove him to the Garcias' property. Defendant was there when Souza and Sawyer arrived, in separate vehicles, around 9:00 a.m. As on the previous day, defendant seemed to be fine, and he performed satisfactory work until the early afternoon, when he said he wanted to leave. Souza paid defendant with a check, and Sawyer drove defendant to his house. During the drive, defendant asked Sawyer if he had "a bud," meaning marijuana, but Sawyer said he didn't know what defendant was talking about. After leaving defendant at his house, Sawyer returned to the Garcias' property and worked with Souza on the sprinkler system until around 7:00 p.m. During this time, Earl Garcia was either working outside on various tasks or sitting on a lawn chair on the porch talking to Souza or Sawyer.

After Sawyer dropped him off, defendant smoked crack cocaine with his brother Ted Pollock. At that time, defendant and Ted were on a three- or four-day run of cocaine use. Later, defendant telephoned Thomas Marin and invited him to come to defendant's house to smoke crack cocaine. Marin drove to defendant's house and honked his car's horn. Defendant and Ted came out of the house and got in Marin's car, with defendant sitting in the front passenger seat and Ted in the backseat. Defendant directed Marin to drive to Palomares Canyon, saying that he intended to get paid some money that was owed him. As they drove on Palomares Canyon Road, they passed Souza's truck, which was parked on the shoulder of the roadway behind Sawyer's car. At defendant's request, Marin parked behind Souza's truck.

Defendant walked to Souza's truck and asked Souza for "a couple hundred dollars" as an advance on salary for work defendant would perform at some future time. Souza said that he did not have the money, and that defendant probably could have earned that much but "it didn't work out." Defendant said he understood; he was polite and did not seem angry. Souza thought that defendant seemed fine and did not note any signs of intoxication or drug-induced impairment.

Defendant got back in Marin's car and directed him to drive in the direction away from the Garcias' property, then to pull over and wait until his boss (that is, Souza) had gone. Defendant said that he had not gotten any money from his boss and that he was going to talk to his "other boss." After waiting about five minutes, Marin drove back down Palomares Canyon Road, and defendant directed him to stop at the Garcias' property. Defendant got out of the car, telling Marin he would be "right back," and walked toward the Garcias' house.

A short time later, Marin and Ted Pollock heard a woman's screams coming from the Garcias' house. Benjamin Wilson, who lived next door to the Garcias, and Joyce Norton Jones, who lived on the other side of Wilson, also heard these screams. Wilson went outside and saw Earl Garcia standing at the back of his truck, which was parked in the Garcias' driveway. Earl Garcia said "What the hell is going on?" and ran into the house. Wilson heard what sounded to him like a chair falling and a table being pushed across a linoleum floor, followed by silence.

Defendant returned to Marin's car with blood on his hands, shirt, and pants. He had deep cuts on his hands. Defendant got in the car and said "Go, just go" or "Get me out of here, I don't care if you have to go a hundred miles an hour." Marin and Ted Pollock asked defendant what had happened. Defendant said: "You don't want to know. All I know is I'm going to state prison." As they drove out Palomares Canyon Road, defendant threw a butcher knife out the car window. Marin suggested defendant go to the hospital to obtain treatment for the cuts on his hands, but defendant refused.

Benjamin Wilson, the Garcias' neighbor, went to the Garcias' house to find out what had happened. He saw blood on the sidewalk leading to the front porch and a bloody footprint on the porch. When he looked through the doorway into the kitchen, he saw Earl Garcia lying in a pool of blood. Wilson returned home and telephoned the police.

Marin drove back to defendant's house. Defendant and Ted Pollock went inside, and defendant changed his clothes. Defendant's mother saw him washing his hands in the backyard with a garden hose and asked what had happened. Defendant said he had gotten into a fight with "some Mexicans" and had cut his hands "on metal of a car." Defendant and Ted Pollock came back outside to Marin's car, and defendant asked Marin to drive them to Oakland. On the way, while driving on Golf Links Road in Oakland, defendant opened the car door and threw something out. Defendant directed Marin to a crack house in Oakland, where defendant made three purchases of rock cocaine, spending approximately $40 for each purchase. Defendant also paid for some gauze bandages that someone wrapped around his hands. A

little later, two men, one with a gun and the other with an axe, robbed defendant of his remaining money, after which Marin drove defendant and Ted Pollock to their house and dropped them off.

Defendant asked his mother to take him to the hospital. She drove defendant and Ted Pollock to Fairmont Hospital and returned home. Fairmont Hospital sent defendant to Highland Hospital to get his hands sewn up. Later that morning, defendant's mother picked up defendant and Ted Pollock at Highland Hospital and brought them home. They were both in bed when she left for work.

Later that day, September 5, sheriff's deputies. came to defendant's house and knocked on the door. Defendant ran out the back door and jumped over the fence. The deputies found defendant crouched behind the fence, in the neighbor's yard, and they arrested him. They seized a pair of shoes from defendant's bedroom that were later determined to be consistent with a bloody shoe print on the porch of the Garcias' residence.

Meanwhile, sheriff's deputies arriving at the Garcia residence on the evening of September 4, 1989, had found the body of Earl Garcia on the kitchen floor. A chair was on its side and the kitchen table was askew. In the master bedroom, the deputies found the body of Doris Garcia on the floor at the foot of the bed. On the bed, they found a purse and a wallet that belonged to Doris. There was no currency in the purse or the wallet, although Doris usually kept around $100 in her purse. The officers recovered a bloodstained butcher knife from the side of Palomares Canyon Road at a place indicated to them by Ted Pollock. The knife exactly fit an empty slot in a butcher-block knife holder in the Garcias' kitchen, and it was of the same style and make as other knives in the holder.

A sheriff's deputy found a pair of bloodstained gray pants on the shoulder of Golf Links Road in Oakland on September 4, 1989.

Defendant's blood type was consistent with blood found on the molding around a door in the Garcias' house, on the gray pants found on Golf Links Road, on the butcher knife found on Palomares Canyon Road, and inside Thomas Marin's car. Doris's blood type was consistent with blood found on the purse on the bed in the master bedroom. Hair found in Marin's car and in the hallway of the Garcias' house (and which appeared to have been forcefully pulled out) was consistent with Doris's hair, but inconsistent with defendant's hair.

The autopsy of Doris Garcia revealed multiple stab wounds and incised wounds, which were the cause of her death. Stab wounds were found on the

left and right front neck, right back neck, and right front chest. Incised wounds (shallower than the stab wounds) were found on the left front neck, and on the right and left front chest. These wounds injured the right and left carotid arteries, the right jugular vein, and the larynx. In addition, scrapes were observed on the left lip; on the right sides of the nose, chin, and neck; and on the right hand. Bruises were observed on the left upper arm, the inside of the left wrist, the left lower leg, the right collarbone, the area below the left collarbone, and the right breast.

The autopsy of Earl Garcia revealed multiple stab wounds and incised wounds, which were the cause of his death. A stab wound was observed on the right side of the neck. Incised wounds were observed on the right side of the face at the lip, on the left and front of the neck, on the right front shoulder, on the left forearm and back of the left hand, and on the right forearm and the back of the right hand. The wounds injured the right and left carotid arteries, the right and left jugular veins, the esophagus, the larynx, and the vertebral column in the neck area. Scrapes were observed on the right check, on the inside of the left wrist, on the front of the right thigh, and on the front inside of the left lower leg.

According to the autopsy surgeon, the butcher knife found on Palomares Canyon Road could have caused the fatal injuries to Doris and Earl Garcia. No drug or alcohol was found in the blood of either victim.

### B. *Defense Case at the Guilt Phase*

The sole witness for the defense was S. Alex Stalcup, a medical doctor specializing in addiction medicine. He had interviewed defendant in August 1993, and had reviewed a transcript of the preliminary hearing, a report of neuropsychological testing of defendant, and defense investigative reports of witness interviews. In his opinion, defendant was a drug addict on September 4, 1989, when the murders occurred. Drug addiction, a chronic progressive illness, has three diagnostic symptoms: (1) a compulsion to take the drug, (2) continued use of the drug despite adverse consequences, and (3) a craving for the drug causing significant physical or mental discomfort resulting from a chemical imbalance and producing irritability, distractibility, agitation, and anxiety. Defendant had each of these symptoms.

According to Dr. Stalcup, crack cocaine abuse typically follows a pattern of three- to four-day binges, involving around-the-clock use, at two-week intervals. At the beginning of a binge, smoking crack cocaine produces an intensely pleasurable experience. As the binge progresses, the intensity of the pleasure resulting from use decreases, while the depression and other negative feelings that ensue when the pleasure has passed become more pronounced, eventually producing a sense of desperation known as "tweaking,"

which is a very negative psychological condition that the user experiences as intolerable and that causes the user to be hyperactive and hypervigilant. It is a time of great danger in which the user will do anything to get more of the drug. During the "tweaking" stage of a binge, the sight of an object associated with the drug high, such as money, may trigger or cue an extraordinary craving for the drug. The final phase of the binge is the "crash," in which the user may sleep nonstop for up to two or three days.

### C. Guilt Phase Verdicts

The jury found defendant guilty of the first degree murders of Earl and Doris Garcia, with findings that he personally used a knife to commit each offense. As special circumstances making defendant eligible for the death penalty, the jury found that defendant committed each murder while engaged in the commission or attempted commission of burglary and robbery, and that defendant had been convicted in this proceeding of more than one offense of murder, at least one of which was murder in the first degree.

### D. Prosecution's Penalty Phase Case in Aggravation

On March 7, March 25, April 1, and September 15, 1990, while defendant was incarcerated awaiting trial in this case, custodial officers found razor blades in his cell at the county jail. The razor blades were each single-edged, around two and one-half inches in length and one-quarter inch in width. They evidently had been removed from disposable razors that inmates were allowed to use for shaving in designated areas of the jail, but that inmates were not permitted to have in their cells. Jail inmates commonly used razor blades as weapons, generally after fastening them to a handle of some sort, although a blade without a handle also could be used as a weapon.

The prosecution presented victim impact evidence through the testimony of three close friends of murder victims Earl and Doris Garcia, a brother of Doris Garcia, and an adult son of Earl and Doris Garcia. One of the friends met Doris Garcia through a Bible study class for children that Doris taught. The witnesses described Doris as a very generous and kind person, and a devoted wife and mother. They described Earl as hardworking and enthusiastic, with a great sense of humor. They testified to the grief they experienced as a result of the Garcias' deaths. Some witnesses described how this grief was exacerbated by knowledge of the "savage" manner in which the Garcias were killed and the pain they must have experienced during their final minutes.

## E. *Defense Penalty Phase Case in Mitigation*

For its case in mitigation, the defense presented evidence of defendant's life history. Clinical Neuropsychologist Nell Riley provided expert opinions about defendant's learning disabilities and how they had influenced his life.

Defendant was born in 1967, the second child of his mother's marriage to Russell Lyle Pollock. Ted, defendant's older brother, had been born in 1959. Defendant's mother also had a daughter, Jane, from an earlier marriage. The family lived in Portland, Oregon, from 1962 to 1972. Jane married and settled in Oregon in 1972 when the rest of the family moved to San Lorenzo. In 1973, the family moved to the Kelly Hill neighborhood in Hayward.

Defendant's father was employed in an aluminum siding business, then took a job servicing vending machines. He was "very strict," but defendant was too young to receive much punishment. Defendant's father occasionally took defendant with him in his truck on his vending machine route. Defendant's father was a "habitual liar" who maintained a relationship with a woman with whom he had lived and had children, before marrying defendant's mother.

In 1975, when defendant was around eight years old, his father was diagnosed with lung cancer and died seven months later. Defendant and Ted visited their father in the hospital during this time. Defendant's mother had not worked during the marriage, but around 1979 she took a job at a dry cleaning store, and she continued working there for 14 years. For most of this time, she worked 60 hours per week, and as a result she was seldom at home to provide adult supervision for defendant. Ted continued to live in the house but never obtained steady employment, although he did occasional part-time work.

Defendant attended the local public schools. He did well in elementary school for the first two years, then experienced increasing difficulties with reading, spelling, and math. Unable to do the work, defendant took a dislike to school. In junior high, defendant often did not go to school. He was two to three years behind in reading and math. Defendant's mother gave permission for the school's truant officer to enter her home to take defendant to school.

Neuropsychologist Nell Riley reviewed defendant's school records and administered various tests to defendant in 1993, while defendant was incarcerated pending trial in this matter. She testified that on a standard IQ test defendant had scored 83 for verbal but 113 for performance, a 30-point difference that is very unusual, but consistent with developmental learning disabilities and attention deficit hyperactivity disorder (ADHD). On the Wide

Range Achievement Test, Revised, defendant's reading was in the 6th percentile, his spelling was below the 1st percentile, and his math was in the 2d percentile. Defendant's errors on this test were characteristic of dyslexia. His school records were also consistent with learning disability. His academic problems began in third grade, and teachers' comments in school records about defendant's difficulties paying attention and staying on task were consistent with ADHD. Because he was never diagnosed with ADHD, defendant never received treatment for that disorder. ADHD kids are often unpopular because of their impulsivity—they do and say things without thinking.

Defendant's former teacher, Dorris Kay Lawrence, testified that defendant was quiet and shy at school, and that he did not have behavior problems. But he had social problems. Other students teased him, and he had personality conflicts with some students. He responded to these problems by withdrawing. He "would hold it in, and would turn beet red in the face." He was "very much of a loner" who "had a shell around him." He had one close friend in junior high, Ken Allen Yount, with whom he often skipped school.

Defendant was passed through to high school because of his age, size, and demeanor, although academically he was not ready for high school without special help. In high school, defendant was placed in a resource program for educationally handicapped students, but he was removed from the program because of his poor attendance, which also disqualified him from vocational training programs. Defendant's isolation increased; he did not seem to have any friends at school. Connie Marie Russell, who was defendant's girlfriend for around five months when she was 14, described defendant during this period as quiet, withdrawn, depressed, and suicidal. Defendant never used drugs in her presence.

Defendant lived in a neighborhood where drug dealing on the streets was common. Defendant was one of the youngest children in a neighborhood group that included his brother Ted, and defendant was often teased by the others. Delores Lee Jackson, who lived next door to defendant's family, testified that Ted seemed to be "slow for his age," and that defendant looked up to and followed Ted. To Harold David Mattingly, an adult who also lived in the neighborhood, defendant seemed "kind of sad and lonesome."

When he was still in junior high, defendant began using marijuana, supplied by Ted. Later, around age 15, defendant began snorting methamphetamine. Defendant and Ted often used drugs together. When defendant later started using crack cocaine, his personality changed. He became "really spacey" and "he didn't care if he hurt somebody."

Neuropsychologist Nell Riley testified that substance abuse is commonly associated with learning disabilities and ADHD. Reading disability is the strongest predictor of substance and chemical dependency because drugs offer a brief respite from the negative feelings associated with poor performance at school. Children with ADHD may self-medicate with stimulants like methamphetamine and cocaine.

When defendant was around 14 years old, he was arrested for burglary and placed on juvenile court probation. He remained on probation until he was 18 years old. In 1984, when he was 16 years old, defendant spent six months at Chabot Ranch, a juvenile court facility, after being charged with petty theft from a department store. After high school, defendant had a series of part-time jobs, including landscaping and automobile painting. When doing these jobs, defendant was polite and diligent.

While he was incarcerated awaiting trial in this case, defendant learned that Wendy Marie Thornberry, the daughter of his half sister Jane, had begun using drugs. He wrote her letters and spoke to her on the telephone, encouraging her to get away from drugs and from friends who used drugs. She eventually took his advice and stopped using crack cocaine.

Defendant's mother testified that while he was incarcerated awaiting trial in this case, defendant acquired "an entirely different attitude" and a "better outlook on life." He had become more caring about other people and had expressed remorse for what he had done. On cross-examination, however, defendant's mother admitted that during a jail visit in November 1992, defendant had told her that he had been thinking of how easy it would be to escape during a medical appointment by killing the police officer who escorted him.

## II. Issues Relating to Guilt and Special Circumstances

### A. *Photographs and Videotape of Murder Victims*

Defendant contends that the trial court erred in denying his motion to exclude a videotape of the crime scene and certain photographs of the bodies of murder victims Earl and Doris Garcia, and thereby violated defendant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution.

At the outset of trial, before jury selection had commenced, the defense moved to exclude from evidence a videotape of the crime scene (the Garcias' home) showing the bodies of the homicide victims, Earl and Doris Garcia,

with the knife wounds, and also certain crime scene and autopsy photographs. Defendant objected to this evidence as cumulative, irrelevant, and unduly prejudicial.

After viewing the videotape and the photographs, and hearing counsel's arguments, the trial court denied the motion as to the videotape and as to some photographs, but it granted the motion as to other photographs that it found to be cumulative or unduly prejudicial. More specifically, the trial court excluded six of the 16 autopsy photographs of Earl Garcia's body; two of the 10 autopsy photographs of Doris Garcia's body; and 24 of the 39 crime scene photographs. Defendant argues that the trial court should have excluded the crime scene videotape and all photographs of the victims' bodies. We find no abuse of discretion.

■ "The admissibility of victim and crime scene photographs and videotapes is governed by the same rules of evidence used to determine the admissibility of evidence generally: Only relevant evidence is admissible. [Citations.] The trial court has broad discretion in deciding the relevancy of such evidence. [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 641 [106 Cal.Rptr.2d 629, 22 P.3d 392].) In a prosecution for murder, photographs of the murder victim and the crime scene are always relevant to prove how the charged crime occurred, and the prosecution is "not obliged to prove these details solely from the testimony of live witnesses." (*People v. Turner* (1990) 50 Cal.3d 668, 706 [268 Cal.Rptr. 706, 789 P.2d 887].)

Here, the videotape and the photographs showing the wounds inflicted on the two murder victims and the positions in which their bodies were found in the house were relevant to corroborate and illustrate the testimony of the investigating officers about the condition in which they found the crime scene and to corroborate and illustrate the testimony of the autopsy surgeon about the victims' knife wounds. They were relevant to establish that two murders had occurred and to support the prosecution's theories of premeditation and deliberation and felony murder in the commission of robbery and burglary. "Although defendant contends the photographs were inadmissible because they had no bearing on the only disputed question at trial (his mental state), we have made clear that the absence of a defense challenge to particular aspects of the prosecution's case or its witnesses does not render victim photographs irrelevant. [Citations.]" (*People v. Lewis, supra,* 25 Cal.4th at p. 641.)

■ The photographs and videotape were not inadmissible as being cumulative of the witness testimony they were used to illustrate and support. "We have often rejected the argument that photographs of a murder victim should be excluded as cumulative if the facts for which the photographs are

offered have been established by testimony. [Citations.]" (*People v. Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610]; accord, *People v. Michaels* (2002) 28 Cal.4th 486, 532 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) Because the photographs and videotape could assist the jury in understanding and evaluating the witnesses' testimony, the trial court was not required to exclude them as cumulative.

■ Finally, the photographs and videotape were not inadmissible under Evidence Code section 352 on the ground that their probative value was substantially outweighed by the risk of undue prejudice to defendant. We apply the deferential abuse of discretion standard to a trial court's rulings under Evidence Code section 352. (*People v. Michaels, supra,* 28 Cal.4th at p. 532; *People v. Kipp* (2001) 26 Cal.4th 1100, 1136 [113 Cal.Rptr.2d 27, 33 P.3d 450].) Having reviewed the challenged exhibits, we conclude that the trial court did not abuse its discretion and that the admission of these exhibits did not violate defendant's constitutional rights. Although the depictions of the victims' bodies are disturbing, as such evidence always is, none of the exhibits is unduly gruesome or inflammatory.

### B. *Exclusion of Testimony by Drug Addiction Expert*

Defendant contends that the trial court erred in precluding certain testimony by the only defense witness at the guilt phase, Dr. S. Alex Stalcup, who testified as an expert on drug addiction. Defendant claims that, by precluding Dr. Stalcup from answering two questions, the trial court not only erred under state evidence law, but also violated defendant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution.

Dr. Stalcup testified that defendant was a drug addict on September 4, 1989 (the date of the murders), and that the Diagnostic and Statistical Manual of Mental Disorders (3d ed. rev.) recognized addiction as a mental disease or disorder. Dr. Stalcup described the diagnostic symptoms of drug addiction and explained why, in his opinion, defendant exhibited each of these symptoms. Dr. Stalcup described certain risk factors for addiction and related those factors to defendant's background. Dr. Stalcup then described the typical pattern for an addict's use of crack cocaine, in binges occurring at two-week intervals, explaining that toward the end of a binge the addict would experience a state known as "tweaking," a very negative psychological state that the addict experiences as intolerable and during which the addict would "do anything, anything at all in this drug-driven state to get more coke." Dr. Stalcup testified that some of defendant's behavior on September 4 and 5, 1989, was consistent with tweaking. Defendant told Dr. Stalcup that he drank a half-pint of strong alcohol (Southern Comfort) on the way to the Garcias'

house, and Dr. Stalcup also considered it significant that defendant bought and used crack cocaine before obtaining medical treatment for his severely injured hands.

Defense counsel then asked Dr. Stalcup this question: "[H]ow does this binge cycle or pattern of use and abuse apply specifically to [defendant] in the days before the death of the Garcias and on the day of the death of the Garcias?" The trial court did not permit this question, explaining that because Dr. Stalcup "didn't examine or see" defendant in September 1989, the witness "can't give you that opinion." The court suggested that counsel ask a hypothetical question. Defense counsel then framed a hypothetical question, asking Dr. Stalcup to assume that "someone was using crack cocaine, was working, making some money, immediately using more crack cocaine," and that this person "goes into a home, sees some money lying around, can't remember what happened thereafter." Counsel then asked whether this described conduct was "consistent with somebody in your medical opinion who was in a binge cycle?" Dr. Stalcup replied, "Absolutely" and proceeded to explain this answer.

In so restricting Dr. Stalcup's testimony, the trial court applied well-established state law principles governing expert testimony. "When expert opinion is offered, much must be left to the trial court's discretion." (*People v. Carpenter* (1997) 15 Cal.4th 312, 403 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Although an expert may base an opinion on hearsay, the trial court may exclude from the expert's testimony "any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value." (*People v. Montiel* (1993) 5 Cal.4th 877, 919 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

■ Here, the trial court acted within its discretion in preventing Dr. Stalcup from expressing an opinion on whether defendant's conduct immediately before, during, and after the charged crimes was consistent with the binge pattern of crack cocaine use. That opinion would necessarily be based in large part on defendant's hearsay statements to Dr. Stalcup during an interview four years after the events in question. To avoid putting this potentially self-serving and unreliable hearsay before the jury, without defendant ever having testified and submitted to cross-examination, the trial court could properly require the defense to proceed by the use of hypothetical questions. (*People v. Price, supra,* 1 Cal.4th at p. 416; see *People v. Gardeley* (1996) 14 Cal.4th 605, 618–619 [59 Cal.Rptr.2d 356, 927 P.2d 713].) Through the posed hypothetical question, the trial court allowed the defense to put before the jury the theory that defendant killed the Garcias while he was in the tweaking stage of a crack cocaine binge.

During redirect examination, the defense asked whether the sight of money could act as an "environmental cue" that would trigger an intense craving in an addict. The trial court restated the question this way: "In other words, if a person is an addict, sees money, does that strike that environmental cue that he wants more dope?" Dr. Stalcup replied: "Judge, it would be as if you hadn't eaten for three days, were very very hungry, and I suddenly put you down in the middle of Sizzler. You would feel, although you were hungry to begin with, you'd feel really hungry then. And even though I don't think you're a thief, if someone wouldn't give you the food, I'll bet you'd grab it and stuff it down your mouth. You'd be out of control. [¶] So the situation of an environmental cue many times, many times I've had patients tell me, doc, I felt like a robot. I felt like I was watching a movie of somebody else. I watched my hands move. I could not control myself. . . . The cue is the signal that triggers the lust for the drug."

The trial court then sustained the prosecutor's objection to a follow-up question by defense counsel asking: "And the action of that lust is robot-like?" The court acted within its discretion in making this ruling. Although the prosecutor did not state the basis for the objection, or the trial court the basis for its ruling, we infer that the court excluded the proposed testimony as cumulative because Dr. Stalcup had already fully explained a crack cocaine addict's response to an environmental cue, including the testimony that many addicts described the experience as feeling "like a robot." To ask whether this feeling was "robot-like" was merely to request repetition of this testimony.

The challenged trial court rulings did not violate state evidence law, nor did they deny defendant his constitutional rights under the federal Constitution. "Application of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035 [99 Cal. Rptr. 2d 1, 5 P.3d 68]; accord, *People v. Snow* (2003) 30 Cal.4th 43, 90 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Boyette* (2002) 29 Cal.4th 381, 427–428 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Gurule* (2002) 28 Cal.4th 557, 620 [123 Cal.Rptr.2d 345, 51 P.3d 224].) The rulings did not deprive defendant of a meaningful opportunity to present a defense. (See *Crane v. Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636, 106 S.Ct. 2142].) In his testimony, the defense expert fully described the nature of crack cocaine addiction and, through hypothetical questions and by other means, related that information to the facts of this case as revealed by the evidence admitted at trial.

C. *Instructions on Mental Disorder and Felony Murder*

Defendant contends that the trial court erred in instructing the jury on the mental states required for felony murder in the commission of robbery and

burglary as they relate to a defense based on a mental disorder. Defendant claims that by this alleged misinstruction the court not only erred under state law, but also violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution.

The trial court instructed the jury that an unlawful killing in the commission or attempted commission of a robbery was first degree felony murder "where there was in the mind of the robber the specific intent to commit such robbery and to permanently deprive the owner of his property." The court also instructed the jury that an unlawful killing in the commission or attempted commission of a burglary was first degree felony murder "where there was in the mind of the perpetrator the specific intent to steal, take, and carry away the personal property of any value with the specific intent to deprive the owner permanently." Returning to this subject, the court said: "Now again, the unlawful killing of a human, whether intentional, unintentional, or accidental, which occurs as a result of the commission of or the attempt to commit the crime of burglary or the crime of robbery where there was in the mind of the robber or burglar the specific intent to commit such crime is murder of the first degree."

Turning to defenses based on intoxication or mental defect, the trial court gave these instructions: "Now, let's go back to the felony murder. In the crime of robbery, a necessary element of the crime is the specific intent to permanently deprive the owner of his property. That's the specific intent we're concerned about. [¶] If the evidence shows that the defendant was intoxicated at the time of the offense, you may consider his state of intoxication or mental disorder, if any, in determining if the defendant had such required mental state. [¶] Did the intoxication or mental disorder prevent him from having the specific intent to permanently deprive the owner of his property? [¶] In the crime of burglary, a necessary element of the crime is the specific intent to steal and permanently deprive the owner of their property. [¶] Again, if the evidence shows that the defendant was intoxicated at the time of the offense, you may consider his state of intoxication or mental disorder, if any, in determining if the defendant had such required mental state. [¶] In other words, did his intoxication or mental disorder affect his ability to have the intent to steal and permanently deprive the owner of his property, which is the necessary specific intent required in the crime of burglary."

Defendant asserts that these instructions were erroneous in stating or implying that the only specific intents required for felony murder in the commission of robbery or burglary were the specific intents required for the commission of the underlying felony of robbery or burglary. As defendant

points out, this court has stated that the mental state required for felony murder is "simply the specific intent to commit the underlying felony." (*People v. Hart* (1999) 20 Cal.4th 546, 608 [85 Cal.Rptr.2d 132, 976 P.2d 683].) Defendant argues that a specific intent to commit the underlying felony means a specific intent to commit the crime as a whole or a specific intent to commit each element of the underlying felony, and not merely the specific intent, if any, that is required for the commission of the underlying felony.

■ Defendant is mistaken, at least as to underlying felonies that are specific intent crimes. For felony murder in the commission of a robbery or of a burglary in which entry is made for the purpose of theft, the only specific intent that the prosecution must prove is the specific intent to steal the victim's property, which includes a specific intent to permanently deprive the victim of the property. (*People v. Lewis, supra,* 25 Cal.4th at p. 642.) A defendant who has this specific intent has the only specific intent required for liability under the felony-murder rule. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335] [evidence of intent to steal sufficient for robbery felony murder]; *People v. Avena* (1996) 13 Cal.4th 394, 414 [53 Cal.Rptr.2d 301, 916 P.2d 1000] [intent to rob means an intent to permanently deprive the victim of property]; *People v. Cain* (1995) 10 Cal.4th 1, 31 [40 Cal.Rptr.2d 481, 892 P.2d 1224] ["Defendant's admission that he entered the residence for the purpose of stealing money proved his specific intent to commit burglary"]; *People v. Visciotti* (1992) 2 Cal.4th 1, 56 [5 Cal.Rptr.2d 495, 825 P.2d 388] [stating that intent to steal is the only mental state relevant to felony murder in the commission of robbery].) Thus, the trial court instructions on this point were correct.

### D. *Instruction on Concurrence of Act and Intent*

Defendant contends that the trial court erred in not instructing the jury on the concurrence of act and specific intent required for first degree felony murder, and thereby violated defendant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution.

The trial court instructed the jury, in the words of CALJIC No. 3.31, that "in the crime of murder, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator." After instructing on express and implied malice, the court turned to felony murder, explaining, in a close paraphrase of CALJIC No. 8.21, that "the unlawful killing of a human being, whether intentional, unintentional, or accidental, which occurs as a result of the commission of or the attempt to commit the crime of robbery where there was in the mind of the robber the specific intent to commit such robbery and to permanently deprive the owner of his property

is murder of the first degree." Similarly, the court explained that "the unlawful killing of a human being, whether intentional, unintentional, or accidental, which occurs during the commission of or the attempt to commit the crime of burglary where there was in the mind of the perpetrator the specific intent to steal, take, and carry away the personal property of any value with the specific intent to deprive the owner permanently is murder of the first degree." The court then fully instructed on the elements of robbery and burglary.

Summing up these instructions, the court stated: "Now, again, the unlawful killing of a human being, whether intentional, unintentional, or accidental, which occurs as a result of the commission of or the attempt to commit the crime of burglary or the crime of robbery where there was in the mind of the robber or burglar the specific intent to commit such crime is murder of the first degree. In other words, you don't have to worry about malice. You don't have to worry about degree. If you find the killing occurred during a robbery and/or a burglary, the law supplies the malice, the law supplies the degree, and it is murder of the first degree."

These instructions were sufficient to inform the jury that to be guilty of felony murder in the commission of robbery or burglary the defendant must form the intent to steal before or during rather than after the application of force to the victim, and that the defendant must apply the force for the purpose of accomplishing the taking. (*People v. Hughes* (2002) 27 Cal.4th 287, 358–360 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Silva* (2001) 25 Cal.4th 345, 371 [106 Cal.Rptr.2d 93, 21 P.3d 769]; *People v. Hayes* (1990) 52 Cal.3d 577, 625–626, 629 [276 Cal.Rptr. 874, 802 P.2d 376].) More specific instructions on this issue are considered pinpoint instructions that the trial court is required to give only upon request (*People v. Hughes, supra,* at p. 361), and then only when the proposed instruction is not argumentative, does not merely duplicate other instructions, and is supported by substantial evidence (*People v. Bolden* (2002) 29 Cal.4th 515, 558 [127 Cal.Rptr.2d 802, 58 P.3d 931]). Here, the defense did not request more specific instructions on this issue.

During jury deliberations on guilt, the jurors indicated they had questions about the law and were brought back into open court, where a juror posed this question: "[I]f the person is dead when the property is taken, is it robbery?" The court gave this response: "The ticket is this: What is the intent of the perpetrator? [¶] If I intend to go—to kill you, that's my primary intent, and then I kill you, and then you're dead, I figure you don't need your money anyway, so I take your money, that could be a robbery, but it wouldn't necessarily be the felony murder for the purpose of this case. . . . [¶] It still could be a robbery. You can rob a dead person, but we're talking about a

felony murder. What you have here, you got to look at the primary motive or intent of the defendant. If the primary motive was to go and kill and the robbery is incidental to the killing, then the felony murder wouldn't apply. He may still be guilty of robbery, but the felony murder wouldn't apply. [¶] If the primary intent is to rob and the killing occurs during a robbery, to effect his escape, then the felony murder applies."

This additional instruction reinforced the earlier instructions explaining that, to be guilty of felony murder, there must be "a union or joint operation of act or conduct and a certain specific intent," and that the killing must be "a result of" the commission of the felony or, in other words, that a defendant must have formed the specific intent to steal the victim's property when the fatal blow is struck. We find no error in the instructions on this point of law.[2]

In arguing to the contrary, defendant asserts that the mental state required for felony murder in the commission of a robbery or burglary is the specific intent to commit the underlying felony, and that this mental state requires something more than merely a specific intent to steal (which includes an intent to permanently deprive). As we explained in the discussion of the previous contention, defendant's assertion is incorrect.

### III. ISSUES RELATED TO PENALTY

#### A. *Defendant's Possession of Razor Blade in Jail*

Defendant contends that the trial court erred in not excluding evidence he possessed razor blades in his jail cell and by instructing the jury regarding the use of this evidence, and that the evidence and instructions violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution.

After the jury had returned the guilty verdicts, and before the penalty phase began, the defense moved to exclude evidence that defendant had possessed razor blades in his jail cell, arguing that the evidence did not fall within any statutory aggravating factor. The trial court held a hearing out of the jury's presence at which Rae Ballard testified that on March 7, 1990, while employed as a deputy sheriff, she found a razor blade in defendant's cell at the county jail. The blade had a single edge and was approximately two and one-half inches long by one-quarter inch wide. It had been removed from a disposable razor. In the jail, possession of such a blade in a cell was not permitted, and inmates were known to use such blades as weapons, often

---

[2] Because defendant was not separately charged with robbery, we express no opinion on whether the quoted statements accurately describe the elements of that offense.

after fastening them to handles. After hearing this testimony, the trial court denied the defense motion to exclude evidence. Thereafter, during the penalty trial, the prosecution presented evidence that defendant had been found in possession of a razor blade in his jail cell on four occasions between March 7 and September 15, 1990.

■ At the penalty phase, the jury is permitted to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) In this context, the term "criminal activity" includes only conduct that violates a penal statute. (*People v. Kipp, supra,* 26 Cal.4th 1100, 1133; *People v. Boyd* (1985) 38 Cal.3d 762, 772 [215 Cal.Rptr. 1, 700 P.2d 782].) Here, defendant argues that possession of a razor blade in jail did not violate any penal statute unless the blade was fastened to a handle of some sort, and that the evidence thus did not fall within the reach of section 190.3, factor (b).

■ Section 4574 makes it a felony for a county jail inmate to possess a "deadly weapon[]." Within the meaning of this penal statute, an object is a deadly weapon if it has a reasonable potential of inflicting great bodily injury or death. (*People v. Martinez* (1998) 67 Cal.App.4th 905, 912 [79 Cal.Rptr.2d 334]; *People v. Savedra* (1993) 15 Cal.App.4th 738, 745 [19 Cal.Rptr.2d 115].) ■ Even without a handle, a razor blade could be used to slice a victim's throat, wrist, or other vital spot, and thus a detached razor blade has a reasonable potential of causing great bodily injury or death. Accordingly, a county jail inmate's possession of detached razor blades violates section 4574, and evidence of such violations is admissible under section 190.3, factor (b). (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1152–1153 [124 Cal.Rptr.2d 373, 52 P.3d 572]; see also *People v. Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142] ["It is settled that a defendant's knowing possession of a potentially dangerous weapon in custody is admissible under factor (b)."].) The trial court did not err in denying defendant's motion to exclude at the penalty phase evidence that he possessed detached razor blades while incarcerated in county jail awaiting trial in this case.

Defendant challenges the trial court's instructions to the jury on the use of this evidence. The court gave these instructions: "Evidence has been introduced for the purpose of showing that the defendant committed the following criminal activity which involved the express or implied use of force or violence or threat of force or violence. Before you may consider such criminal acts or activity as an aggravating circumstance in this case, you must be satisfied beyond a reasonable doubt that the defendant did, in fact, commit such criminal activity or acts. [¶] . . . This criminal activity which I just referred to as—as violence or threat of violence concerns the violation

Section 4502 of the Penal Code, which is possession of a weapon, to wit, the razor blades, being—while the defendant was being confined in the county jail."

■ The trial court's reference in the instructions to section 4502 was mistaken. Before its amendment in 1994 (Stats. 1994, ch. 354, § 1, p. 2154), section 4502 applied only to state prison inmates and not to county jail inmates. (See *People v. Hughes, supra,* 27 Cal.4th at p. 382 & fn. 23.) Defendant was not prejudiced by this mistake, however, because, as we have explained, another penal statute, section 4574, prohibited possession of deadly weapons such as razor blades by county jail inmates. (*Hughes*, at pp. 383–384.)

Defendant argues that whether the detached razor blades were deadly weapons within the meaning of section 4574 was a question of fact for the jury to decide, and that the trial court's instructions were erroneous insofar as they stated that detached razor blades were deadly weapons as a matter of law. We will assume, without deciding, that defendant is correct. (See *People v. Rodriquez* (1975) 50 Cal.App.3d 389, 396 [123 Cal.Rptr. 185] [stating that whether a razor blade is a deadly weapon is a question of fact].) Defendant was not prejudiced, however, by the jury instructions. To find prejudice, we would need to infer that the jurors, or some of them, (1) thought the razor blades did not have a reasonable potential to inflict great bodily injury or death, and (2) despite such finding, gave the evidence of defendant's possession of the razor blades such weight that it affected the penalty determination. As in *People v. Hughes, supra,* 27 Cal.4th 287, we consider this combination too unlikely to constitute prejudice. As we said there: "It is quite unlikely that the jury would find the object to be . . . not a deadly weapon. But if the jury made that improbable finding, thus minimizing the seriousness of the evidence, it is also quite unlikely that it would then consider the evidence to be so important as to control, or even have a significant impact upon, the penalty determination. The combination of these circumstances (unlikelihood that a properly instructed jury would have disregarded the evidence because it would not believe the shank was deadly plus the unlikelihood that a jury so finding nonetheless would give the evidence significant weight) convinces us that the error was harmless." (*Id.* at p. 384, fn. omitted.)

■ Defendant argues that under the United States Supreme Court's decisions in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], he had a right under the federal Constitution's Sixth Amendment to a jury determination of every factual issue relevant to the penalty determination. Not so. As this court has explained, the *Ring* and *Apprendi*

decisions do not apply to the penalty phase of a capital trial under California's death penalty law. (*People v. Cox* (2003) 30 Cal.4th 916, 971–972 [135 Cal.Rptr.2d 272, 70 P.3d 277]; *People v. Snow, supra,* 30 Cal.4th at p. 126, fn. 32; *People v. Ochoa* (2001) 26 Cal.4th 398, 453-454 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

B. *Victim Impact Evidence*

Defendant contends that the trial court erred in denying in part a motion to limit victim impact evidence and in denying a motion for mistrial after the victim impact witnesses had testified. Defendant further contends that these alleged errors violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution.

In a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825–827 [115 L.Ed.2d 720, 111 S.Ct. 2597].) Under California law, victim impact evidence is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case. (*People v. Boyette, supra,* 29 Cal.4th at p. 444; *People v. Edwards* (1991) 54 Cal.3d 787, 835–836 [1 Cal.Rptr.2d 696, 819 P.2d 436].) But victim impact evidence does not include characterizations or opinions about the crime, the defendant, or the appropriate punishment, by the victims' family members or friends, and such testimony is not permitted. (*People v. Smith* (2003) 30 Cal.4th 581, 622 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

1. *Testimony that murder victim taught Bible school*

During the penalty phase, before any victim impact witness had testified, the trial court granted a defense motion to exclude testimony by the Garcias' friends and relatives "concerning the crime itself, concerning the defendant, and concerning the appropriate sentence in this matter." The trial court permitted only testimony about the impact of the Garcias' deaths on the witnesses and about the Garcias' personal characteristics insofar as they served to explain that impact. Defense counsel questioned whether witnesses should be permitted to testify that they had attended Bible study classes that Doris Garcia had taught. The trial court ruled that such testimony would be admissible only insofar as it explained or illustrated the impact of the victims' deaths because, for example, Doris's death had resulted in the termination of a Bible study class that a witness had been attending. Not

satisfied, the defense moved to exclude "all mention whatsoever of Christianity and Bible study class." The trial court denied this motion, based upon what the court anticipated the evidence would be.

Thereafter, some of the witnesses testified that Doris Garcia had taught Bible study classes. Phyllis Eileen Goodbarn testified that Doris was teaching a Bible study class for children when they first met, and that 20 years later they became close friends when Goodbarn attended a Bible study class weekly in Doris's home. She also testified that she learned of the murders from another member of the Bible study class. Barbara Ann Valett testified that she had lived across the street from the Garcias, and that she and Doris had done many things together, including Bible study.

The trial court did not err in denying the defense motion to exclude all evidence that murder victim Doris Garcia taught Bible study classes. As the trial court correctly recognized, such evidence could be relevant to demonstrate the direct effect of defendant's crime on persons close to the victim. Thereafter, when the witnesses testified about Doris Garcia's Bible study classes, the defense did not object, thereby forfeiting any claim that the testimony exceeded the scope of what the trial court had permitted. (Evid. Code, § 353; see *People v. Navarette* (2003) 30 Cal.4th 458, 515 [133 Cal.Rptr.2d 89, 66 P.3d 1182].)

Defendant argues that trial counsel could not have objected without appearing callous, and thereby alienating the jury, and for this reason we should excuse the normal requirement of a timely objection and a request for an admonition. We reject this argument. A timely objection is statutorily required to preserve a claim of error in the admission of evidence. (Evid. Code, § 353.) Failure to comply with this statutory requirement may not be excused on the ground that a timely objection would be inconvenient or because of concerns about how jurors might perceive the objection.

In any event, the testimony was admissible under the trial court's ruling, which itself was legally correct. Goodbarn mentioned the Bible study classes only to explain how she met Doris Garcia, how they became close friends, and how she had learned of her death. Valett mentioned Bible study only as an example of activities she had shared with Doris Garcia. Neither witness testified about Doris's specific religious beliefs, nor did either suggest that religious doctrines should guide or affect the penalty determination process. The evidence was properly admitted to show the direct effect of the victim's death. (See *Pickren v. State* (1998) 269 Ga. 453 [500 S.E.2d 566, 568–569].)

## 2. *Testimony about brutality of killings*

In response to a question asking how she had learned of the Garcias' deaths and how the news had affected her, Phyllis Eileen Goodbarn testified that someone had told her that Earl and Doris Garcia "had been brutally murdered, that their throats had been slit," and that this was "a terrible, terrible shock." Later, Donald Stephen Garcia, the victims' son, testified that he had cleaned the bloodstains from his parents' house and that he had decided to sell the property because "it was such a savage act, I just couldn't have the memory of their murder that close to me." He also testified that he had been forced to suppress his memories of his parents. He gave this explanation: "[I]f I think about them I'm miserable, so if I don't think about them, I'm not miserable. So it's kind of like my childhood was taken from me and any memory of my parents was taken from me because the—the major problem I have is the savageness of this murder" because he knew his parents must have suffered greatly during the last 15 minutes of their lives. The defense did not object, move to strike, or request an admonition.

The Attorney General argues that by not objecting, moving to strike, or requesting an admonition, the defense forfeited any claim that this testimony was inadmissible. (Evid. Code, § 353; see *People v. Navarette, supra,* 30 Cal.4th at p. 515.) Defendant argues that trial counsel could not have objected without appearing callous, and thereby alienating the jury, and for this reason we should excuse the normal requirement of a timely objection and a request for an admonition. We reject this argument for the reasons explain above in part III.B.1.

 In any event, the evidence was admissible. The witnesses did not testify merely to their personal opinions about the murders. Rather, their testimony was limited to how the crimes had directly affected them. Goodbarn testified that she was intensely shocked not only by the fact of the Garcias' deaths, but also by the brutal manner in which they died. Donald Stephen Garcia testified that the circumstances of his parents' deaths made it impossible for him to remember his parents, or his own childhood, without in some manner imagining the suffering of their final minutes. This was proper and admissible victim impact evidence. As in *Payne v. Tennessee, supra,* 501 U.S. 808, the testimony "illustrated quite poignantly some of the harm that [defendant's] killing[s] had caused; there is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant." (*Id.* at p. 826.)

## 3. *Testimony of victims' friends*

Defendant contends the trial court erred in permitting victim impact evidence by three persons—Phyllis Eileen Goodbarn, Barbara Ann Valett, and

Grace Olive Jensen—who were friends of the victims but not members of their family. Defendant argues that only family members can give victim impact testimony.

■ Defendant is mistaken. The purpose of victim impact evidence is to demonstrate the immediate harm caused by the defendant's criminal conduct. This harm is not limited to the effect of the victims' deaths on the members of their immediate family; it extends also to the suffering and loss inflicted on close personal friends. (See *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1017 [30 Cal.Rptr.2d 818, 874 P.2d 248] [prosecutor's comments about likely suffering of victims' friends was "well within the boundaries of permissible victim impact argument"]; *Sullivan v. State* (Del. 1994) 636 A.2d 931, 939–940 [testimony by victim's neighbor was proper victim impact evidence].)

■ Defendant also contends that only persons who were present at the murder scene during or immediately after the killing can provide victim impact testimony, that such testimony can describe only circumstances known or reasonably foreseeable to the defendant at the time of the crime, and that victim impact testimony should be limited to a single witness. Defendant is mistaken. We have approved victim impact testimony from multiple witnesses who were not present at the murder scene and who described circumstances and victim characteristics unknown to the defendant. (See, e.g., *People v. Boyette, supra,* 29 Cal.4th at pp. 440–441, 443–445.) Finally, "we reject defendant's argument that, if section 190.3, factor (a) ('circumstances of the crime') is interpreted to include a broad array of victim impact evidence, it is unconstitutionally vague." (*Boyette*, at p. 445, fn. 12.)

### C. *Prosecutor's Argument About Lack of Remorse*

Defendant contends that the trial court erred when it permitted the prosecutor to argue to the jurors at the penalty phase that they could consider defendant's lack of remorse as a circumstance in aggravation, and again when it refused to admonish the jury that lack of remorse was not a circumstance in aggravation, and that these trial court errors violated defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution.

At the penalty phase, the defense moved to prohibit the prosecutor from arguing to the jury that defendant had not expressed remorse. The trial court denied the motion. During his argument to the jury, the prosecutor made these statements about defendant's lack of remorse:

"An important consideration for you in determining whether or not he deserves your sympathy or your mercy may be whether or not he's expressed

any remorse for what he's done. What did he do at the scene after he's just done this to these two people? Does he say, I feel bad? Does he say, God, what have I done? No. He's worried about himself, as he always is, first and foremost. He tells his brother Ted, I may go to prison for this if I'm caught. You can consider his lack of remorse as he is fleeing the scene as aggravation. You can consider his lack of remorse later on as just tending to show there isn't any mitigation or the mitigation is not worthy of your consideration.

"Does he have a breakdown when his mom asks him, gee, son, what happened, your hands are cut? I got jumped by some Mexicans at McDonald's. He is able to say that with a straight face. Does he seem like he is feeling any remorse at that time, knowing the scene that he just left? Does he make an anonymous call to the authorities, hey, you might want to run out to the residence and take a look, so that maybe they don't have to be discovered by a member of their own family or a neighbor? He is content to just let them rot there.

"Concerned about himself? What is the first thing he does when he gets to the crack house? He sends James or somebody at the crack house for some bandages and some tape for his hands. He won't go the hospital at that point because he knows that if the crime has been discovered, the county hospital is one of the first places they will look for someone who might have been injured. But the first thing he does is see to himself, bandages and tape for Mr. Pollock. . . ."

The prosecutor also argued that defendant's jailhouse conversation with his mother in which he discussed a plan to kill a police officer during an escape attempt demonstrated that defendant had not changed for the better since his incarceration and was not deserving of the jury's mercy.

Later, out of the jury's presence, the defense objected to the prosecution's argument that the jury could view lack of remorse as a circumstance in aggravation. The prosecutor replied that he had argued only that lack of remorse "at the scene of the crime" was a circumstances of the offense that the jury could consider in aggravation. The trial court overruled the objection, noting for the record that it was treating the objection as timely.

▇▇▇ Conduct or statements at the scene of the crime demonstrating lack of remorse may be considering in aggravation as a circumstance of the capital crime under section 190.3, factor (a). (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1231–1232 [275 Cal.Rptr. 729, 800 P.2d 1159].) "On the other hand, *postcrime* evidence of remorselessness does not fit within any statutory sentencing factor, and thus should not be urged as aggravating."

(*Id.* at p. 1232.) When evidence of postcrime remorselessness has been presented, however, the prosecutor may "stress that remorse is not available as a mitigating factor." (*Ibid.*; accord, *People v. Mendoza* (2000) 24 Cal.4th 130, 187 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Crittenden* (1994) 9 Cal.4th 83, 149 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Sims* (1993) 5 Cal.4th 405, 465 [20 Cal.Rptr.2d 537, 853 P.2d 992].)

We find no impropriety in the prosecutor's argument. In urging the jury to "consider [defendant's] lack of remorse as he is fleeing the scene as aggravation," the prosecutor was properly urging the jury to view defendant's remorselessness during his flight from the murder scene as an aggravating circumstance of the capital crime under section 190.3, factor (a). (*People v. Gonzalez, supra,* 51 Cal.3d at pp. 1231–1232.) In urging the jury to "consider [defendant's] lack of remorse later on as just tending to show there isn't any mitigation or the mitigation is not worthy of your consideration," the prosecutor was properly arguing that remorse was not available as a mitigating factor. (See *id.* at p. 1232.)

Defendant argues that the statements he made to his brother immediately after returning to the car from the victims' house cannot be considered an aggravating circumstance of the crime because they do not unequivocally show a lack of remorse. But that was a factual issue for the jury to decide. The jury could reasonably conclude, as the prosecutor argued, that defendant's remarks demonstrated that he was concerned only about himself and not at all about the two people he had just brutally killed. Similarly, the jury could reasonably conclude that defendant's false statements to his mother about how his hands became injured and his conduct in bandaging his hands at the crack house demonstrated a preoccupation with his own welfare that was inconsistent with genuine feelings of remorse.

Defendant asserts that the prosecutor's argument was improper because the defense did not present any evidence of remorse or attempt to rely on remorse as a mitigating factor. We disagree. Defendant's mother testified that while incarcerated pending trial in this case, defendant had sent her letters "just to tell me how much he loves me and cares for other people *and how sorry he is for what he's done.*" (Italics added.) This was evidence of remorse to which the prosecutor was entitled to respond.

Finally, defendant argues that the prosecutor misled the jury in suggesting that evidence of postcrime remorselessness could negate the entire case in mitigation rather than merely demonstrating the absence of remorse as a mitigating factor. Although the prosecutor's argument was somewhat ambiguous in stating that lack of remorse could establish that "there isn't any mitigation or the mitigation is not worthy of your consideration," we think a

reasonable juror likely would have understood it to mean that the evidence of defendant's remorselessness could show that remorse was not available as a mitigating factor and also that defendant was not entitled to the jury's sympathy. We have not found impropriety in similarly expansive argument. (See, e.g., *People v. Crittenden, supra,* 9 Cal.4th at p. 146 [prosecutor argued that jurors should " 'ask to see at least some evidence of remorse' " by the defendant for his capital crimes before considering a sentence of life without parole].)

When objecting to the prosecutor's argument, defense counsel made a fleeting and ambiguous reference to an admonition. Even if we assume, as defendant urges, that this was a request for an admonition, the trial court properly refused the request after concluding, correctly, that the prosecutor's argument on the topic of remorse was not improper.

### D. *Instructions on Penalty Determination Process*

Defendant contends that the trial court misled the jury about the sentence determination process when it instructed the jury immediately before penalty deliberations began and again later when it responded to jury questions during penalty deliberations, and that these errors violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution.

Before penalty deliberations began, the trial court instructed the jury on the penalty deliberation process in these words:

"Each of you shall consider, take into account, and be guided by the following factors in aggravation and mitigation:

"Number one, factor in aggravation, the circumstances of the crime of which the defendant has been convicted in the proceeding and the existence of the special circumstance found to have been true;

"Two, the presence or absence of criminal activity by the defendant other than the crimes for which he's been tried in the present proceeding which involved the use or attempted use of force or violence or the express or implied threat to use force or violence directed at a person.

"Evidence has been introduced for the purpose of showing that the defendant committed the following criminal activity which involved the express or implied use of force or violence or threat of force or violence. Before you may consider such criminal acts or activity as an aggravating

circumstance in this case, you must be satisfied beyond a reasonable doubt that the defendant did, in fact, commit such criminal activity or acts.

"Now, these instructions do not refer to the evidence the defendant committed theft offenses as a juvenile.

"This criminal activity which I just referred to as—as violence or threat of violence concerns the violation Section 4502 of the Penal Code, which is possession of a weapon, to wit, the razor blades, being—while the defendant was being confined in the county jail.

"Now, again, in determining penalty, the jury shall consider, take into account, and be guided by the following factors in aggravation and mitigation, if possible.

"One mitigating factor is whether or not the offense was committed while the defendant was acting under the influence of extreme mental or emotional disturbance.

"Two, whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or the effect of intoxication by alcohol and/or drugs.

"And any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime.

"In other words, in determining penalty, as mitigating, you may consider and take into account any other circumstance which extenuates the gravity of the crime, even though it may not be and is not a legal excuse for the crime.

"You may consider any other aspect of the defendant's character, his background, his history or record that he offers as a basis for a sentence less than death.

"Ladies and Gentlemen, you may consider sympathy, you may consider compassion for the defendant.

"Now, let me give you the complete list of factors to consider.

"In determining which penalty is to be imposed on the defendant, you shall consider all the evidence which has been received during any part of the trial of this case—guilt[], special circumstance, and penalty.

"And with reference to penalty, you shall take into account and consider and be guided by the following factors if you find the factors are applicable:

"Number one, the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to have been true.

"Two, the presence or absence of criminal activity by the defendant other than the crimes for which he is being tried which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. And, again, that's the razor blades.

"Three, the presence or absence of any prior felony conviction other than the crimes for which the defendant has been tried in the present proceeding.

"Four, whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"Five, whether or not the victims were participants in the defendant's homicidal conduct or consented to the homicidal act.

"Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

"The age of the defendant at the time of the offense.

"Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction I gave you in the first phase which conflicts with this principle." ·

■ Defendant contends this instruction misled the jurors in two respects. In evaluating defendant's arguments, the relevant inquiry is whether, in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice. (See *People v. Seaton* (2001) 26 Cal.4th 598, 687 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Holt* (1997) 15 Cal.4th 619, 677 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

As defendant correctly observes, section 190.3 lists 11 penalty factors that a jury in a capital case, in the statute's words, is to "consider, take into account and be guided by" in reaching its penalty verdict. Here, the trial court recited the complete list of penalty factors, but before doing so it made specific mention of five of the 11 factors. Defendant argues, first, that the double reference to five of the 11 factors erroneously suggested to the jury that only the five highlighted factors were relevant to this case. We disagree. Viewing the instruction as a whole, there was no reasonable likelihood the jury was misled in this fashion. The court expressly instructed the jury to consider, take into account, and be guided by any of the 11 factors that the jury found to be applicable.

■ Next, defendant argues that the trial court erroneously stated or implied that section 190.3, factor (a), the circumstances of the capital offense and the existence of a special circumstance, could only be aggravating. The court did refer to factor (a) as a factor in aggravation. ("Number one, factor in aggravation, the circumstances of the crime of which the defendant has been convicted in the proceeding and the existence of the special circumstance found to have been true.") Although a jury may regard some circumstances of a capital offense as mitigating (see *People v. Bonillas* (1989) 48 Cal.3d 757, 793 [257 Cal.Rptr. 895, 771 P.2d 844]), the only such circumstances that defendant identifies here are that he committed the crimes during a crack cocaine binge and that he did not bring a weapon to the murder scene, suggesting lack of premeditation. But the trial court expressly instructed the jury to consider "whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or the effect of intoxication by alcohol and/or drugs." The court also expressly instructed the jury to consider "as mitigating . . . any other circumstance which extenuates the gravity of the crime, even though it may not be and is not a legal excuse for the crime." Accordingly, there is no reasonable likelihood that the jury was misled to defendant's prejudice by the court's reference to factor (a) as an aggravating factor.

Defendant also asserts that the trial court's instruction was erroneous because it suggested to the jury that section 190.3, factor (b) could only be

aggravating. We have never decided whether factor (b) can only be a factor in aggravation or whether, instead, it can be either aggravating or mitigating. (See *People v. Clark* (1993) 5 Cal.4th 950, 1038 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [suggesting that factor (b) may be mitigating]; see generally *People v. Davenport* (1985) 41 Cal.3d 247, 289–290 [221 Cal.Rptr. 794, 710 P.2d 861].) But even if we assume for the sake of argument that factor (b) can be mitigating, nothing in the trial court's instruction here suggested otherwise. The trial court expressly instructed the jury, twice, to consider "the presence *or absence*" (italics added) of other criminal activity by defendant involving the use, attempted use, or threatened use of force or violence. Because the *absence* of other violent criminal activity by a capital defendant could not be aggravating, the jury would necessarily understand that, depending on the evidence, it could regard factor (b) as aggravating, mitigating, or neutral. (See *People v. Lucero* (2000) 23 Cal.4th 692, 725 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

During its penalty deliberations, the jury sent the trial court a note asking for a dictionary to obtain definitions of the terms "aggravating" and "mitigating." After discussing the matter with counsel in chambers, the trial court responded to the request in these words:

"Under the law, I can't give you a dictionary because these are legal terms, and any reference work uses sometimes various synonyms or—

"Let me try it this way, and then after this, you can ask me a question.

"An aggravating factor is any fact, condition, or event not—attending the commission of the crime but not necessarily part of the crime which increases its guilt or enormity or adds to its injurious consequences which is above and beyond the elements of the crime itself. In other words, it is a fact, a condition, or event which attends the commission of the crime which wouldn't occur if it weren't for the crime but goes beyond the elements of the crime itself. These are the legal elements, that which constitutes murder.

"A mitigating circumstance is any fact or condition or event which as such does not constitute any justification or excuse for the crime but may be considered as an extenuating circumstance in determining the appropriateness of the penalty.

"In other words, you're deciding the appropriate punishment. You've already decided the elements of the crime—felony murder, first degree murder, malice, intent to kill, the effect, if any, of intoxication. You're now looking at punishment.

"You're now deciding what is an aggravating factor, what is a fact, condition, or event which attends the commission but is not necessarily part

of the elements of the crime which increases its guilt or enormity or adds to the injurious consequences which is above and beyond the elements of the crime itself.

"Now, mitigating circumstance is any fact, condition, or event—childhood—any fact or event which though not an excuse and not a justification is and can be considered as an extenuation in determining which of the two punishments you feel is appropriate.

"Let's throw away the law for a second. Aggravate really means to make worse. It's a condition or circumstance or event that results from the crime that makes the crime worse. Therefore, you give the worse penalty.

"A mitigating factor is a factor that makes the crime less severe, not the fact that the crime wasn't committed. It's a thing or a circumstance or an event that alleviates or reduces or moderates the situation in terms of which is the appropriate punishment.

"In other words, you're looking at this in terms of which is the proper punishment, not in terms of the elements of the crime.

"Is there—There may be an event or circumstance which occurred as a result of the crime which aggravates it, makes it worse. Therefore, you give the worse penalty. There may be factors in mitigation which have nothing to do with a crime, but these factors you must consider in determining which punishment you consider.

"For example, if I am a judge, I look at a person in front of me. What is his conduct? Does it aggravate the crime itself? I look at the person. Did he have a good background? Does it mitigate the crime itself? In other words, you're looking at it in terms of which is the appropriate punishment."

Defendant argues that the trial court's definition of "mitigating" as "a factor that makes the crime less severe" focused the jury's attention on the circumstances of the capital crimes rather than on other mitigating circumstances such as the absence of prior felony convictions or defendant's learning disabilities or other childhood hardships. We disagree. In addition to stating that a mitigating factor is one that "makes the crime less severe," the trial court defined mitigating circumstance as "any fact or condition or event which . . . may be considered as an extenuating circumstance in determining the appropriateness of the penalty," as "any fact or event which . . . can be considered as an extenuation in determining which of the two punishments you feel is appropriate," and as "a thing or a circumstance or an event that alleviates or reduces or moderates the situation in terms of which is the

appropriate punishment." To preclude any possible misunderstanding, the court expressly advised the jury that "[t]here may be factors in mitigation which have nothing to do with a crime. . . ." Viewing the instruction as a whole, there was no reasonable likelihood the jury would be misled as to the scope of permissible mitigating considerations.

Next; defendant argues that by twice stating that an aggravating circumstance is one "that makes the crime worse" and "[t]herefore, you give the worse penalty," without also stating the jury should give the lesser penalty if it found a mitigating circumstance, the trial court's definitions were "weighted toward imposition of the worse penalty" and misled the jury into the view that the existence of any aggravating circumstance could justify the death penalty without regard to the weight of the mitigating circumstances. Again, we view the challenged instruction in light of the entire body of instruction that the trial court gave to the jury. On this point, the trial court gave these instructions:

"Now, Ladies and Gentlemen, the weighing of aggravating and mitigating circumstances does not mean a mere mechanical act of counting the number of factors on each side of an imaginary scale or the arbitrary assigning of weight to any particular factor. Any one factor may outweigh all the others. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all the various factors you're permitted to consider.

"In weighing the various circumstances, you determine under the relevant evidence—you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.

"If you should find that the mitigating circumstances outweigh the aggravating circumstances, you must impose the punishment of life without possibility of parole.

"If you find that the aggravating circumstances do not outweigh the mitigating circumstances, that is, if they are equal, you must impose a sentence of life imprisonment without possibility of parole.

"If you find the aggravating circumstances outweigh the mitigating circumstance, you may impose a sentence of death, but to return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial when compared to the mitigating that it warrants death and not life without possibility of parole.

"Therefore, even if you conclude the aggravating circumstances outweigh the mitigating, you may impose death, but you don't have to."

Considering the court's entire charge, there is no reasonable likelihood the jury was misled to the view that any aggravating circumstance would require or permit a death verdict without regard to the existence or weight of mitigating circumstances.

### E. *Rejection of Proposed Jury Instructions*

Defendant contends that the trial court, by refusing certain defense requests for jury instructions, erred under state law and violated defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution.

#### 1. *Labeling factors as aggravating or mitigating*

The defense requested the following special instruction (Special Instruction No. 17) on aggravating and mitigating circumstances: "The factors set forth in subparagraphs (a), (b), and (c) above are the only factors that can be considered by you as aggravating factors. However, you may find one or more of these factors to be (a) mitigating factor(s). You are not required to find that any of these factors are aggravating. It is up to you to determine whether these factors exist, and if they do exist, whether they are mitigating or aggravating. The factors set forth in subparagraphs (d), (e), (f), (g), (h), (i), (j), (k), and (i) [*sic*] below can only be considered by you to be mitigating factors. The absence of a mitigating factor is not, and cannot be considered by you as, an aggravating factor."

The trial court refused the request, explaining that the subject matter of proposed Special Instruction No. 17 was adequately covered by the instructions the court proposed to give.

■ We have consistently held that a trial court in a capital case need not instruct the jury on whether any of the various statutory penalty factors is potentially aggravating or mitigating. (*People v. Prieto* (2003) 30 Cal.4th 226, 271–272 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Earp* (1999) 20 Cal.4th 826, 899 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Frye* (1998) 18 Cal.4th 894, 1026-1027 [77 Cal.Rptr.2d 25, 959 P.2d 183].) "As we explained in *People v. Jackson* [(1980)] 28 Cal.3d [264] at page 316 [168 Cal.Rptr. 603, 618 P.2d 149], with respect to the 1977 death penalty law, 'the aggravating or mitigating nature of these various factors should be self-evident to any reasonable person within the context of each particular case.' " (*People v. Cox* (1991) 53 Cal.3d 618, 675 [280 Cal.Rptr. 692, 809 P.2d 351].) Likewise, a trial court need not instruct that the absence of a mitigating circumstance is not itself an aggravating circumstance. (*People v. Prieto, supra,* at p. 276; *People v. Cunningham* (2001) 25 Cal.4th 926, 1041

[108 Cal.Rptr.2d 291, 25 P.3d 519].) We recently found no error in a trial court's refusal of a proposed instruction identical to defendant's Special Instruction No. 17. (*People v. Carter* (2003) 30 Cal.4th 1166, 1230, & fn. 26 [135 Cal.Rptr.2d 553, 70 P.3d 981]; see also *People v. Osband* (1996) 13 Cal.4th 622, 704–705 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Defendant here does not persuade us to reconsider these decisions.

### 2. *Absence of prior felony convictions*

The defense requested the following special instruction (Special Instruction No. 4) on prior felony convictions: "There has been no evidence presented that the defendant has been convicted of any prior felony. This circumstance should therefore be viewed as a circumstance in mitigation." The trial court did not use Special Instruction No. 4, commenting that the point was covered "in a different way" by the instructions the court proposed to give.

 We have concluded in prior decisions that a trial court need not instruct that the absence of prior felony convictions is necessarily mitigating. (*People v. Jones* (2003) 30 Cal.4th 1084, 1124 [135 Cal.Rptr.2d 370, 70 P.3d 359]; *People v. Lucero, supra,* 23 Cal.4th at p. 730; see also *People v. Jones* (1998) 17 Cal.4th 279, 313–314 [70 Cal.Rptr.2d 793, 949 P.2d 890].) We reasoned that a jury instructed that it may consider the *absence* of prior felony convictions (*People v. Lucero, supra,* at p. 730; *People v. Jones, supra,* 17 Cal.4th at p. 314) and any " 'aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death' " (*Jones, supra,* 30 Cal.4th at p. 1124) will necessarily understand that it may consider in mitigation a defendant's lack of prior felony convictions. Defendant does not persuade us to reconsider these decisions.

In argument to the jury, the prosecutor stated that, because defendant had no prior felony convictions, section 190, factor (c), was "not applicable." Defense counsel argued, to the contrary, that this factor was mitigating. Defendant now contends that his proposed Special Instruction No. 4 was necessary to resolve this dispute in defendant's favor. We have never decided whether factor (c) can only be a factor in aggravation or whether, instead, it can be either aggravating or mitigating. (See *People v. Clark, supra,* 5 Cal.4th at p. 1038 [suggesting that factor (c) may be mitigating]; see generally *People v. Davenport, supra,* 41 Cal.3d at pp. 289–290.) But even if we assume for the sake of argument that factor (c) can be mitigating, nothing in the trial court's instruction here suggested otherwise. The trial court expressly instructed the jury, twice, to consider "the presence *or absence*" (italics added) of prior felony convictions by defendant involving the use, attempted use, or threatened use of force or violence. Because the *absence* of prior felony convictions by a capital defendant could not be aggravating, the jury

would necessarily understand that, depending on the evidence, it could regard the absence of prior felony convictions as mitigating.

### 3. *Victim impact evidence*

The defense requested the following special instruction (Special Instruction No. 16) on victim impact evidence: "Although you have heard testimony from the family and neighbors of Earl and Doris Garcia and you may consider such testimony as a circumstance of the crime, you must not be influenced by passion, prejudice, or sympathy in that regard." The trial court declined to use Special Instruction No. 16, commenting that the point was covered by the instructions the court proposed to give.

The proposed instruction misstated the law in asserting that the jury, in making its penalty decision, could not be influenced by sympathy for the victims and their families engendered by the victim impact testimony. Although a jury must never be influenced by passion or prejudice, a jury at the penalty phase of a capital case may properly consider in aggravation, as a circumstance of the crime, the impact of a capital defendant's crimes on the victim's family, and in so doing the jury may exercise sympathy for the defendant's murder victims and for their bereaved family members. (*People v. Stanley* (1995) 10 Cal.4th 764, 831–832 [42 Cal.Rptr.2d 543, 897 P.2d 481].) The instruction was properly refused as incorrect.

### F. *Consideration of Special Circumstances*

Defendant contends that the felony-murder special-circumstance findings in this case do not adequately narrow the class of death-eligible defendants, and therefore the jury's consideration of those special circumstances at the penalty phase as a penalty factor under section 190.3, factor (a), violated defendant's rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution.

This court has consistently rejected the claim that the statutory special circumstances, including the felony-murder special circumstance, do not adequately narrow the class of persons subject to the death penalty. (*People v. Gurule, supra,* 28 Cal.4th at p. 663; *People v. Kraft, supra,* 23 Cal.4th at p. 1078; *People v. Frye, supra,* 18 Cal.4th at pp. 1028–1029; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1265 [74 Cal.Rptr.2d 212, 954 P.2d 475].) We have also held, contrary to defendant's argument here, that the jury at the penalty phase may properly consider as aggravating the existence of one or more felony-murder special circumstances. (*People v. Seaton, supra,* 26 Cal.4th at pp. 690–691; *People v. Marshall* (1990) 50 Cal.3d 907, 945–946 [269 Cal.Rptr. 269, 790 P.2d 676].) Finally, we are unpersuaded by

defendant's contention that the existence of two robbery-murder special circumstances and two burglary-murder special circumstances improperly and artificially inflated the factors in aggravation for what was essentially a single incident. The jury was properly instructed that "the weighing of aggravating and mitigating circumstances does not mean a mere mechanical act of counting the number of factors on each side of an imaginary scale or the arbitrary assigning of weight to any particular factor." There is no reasonable likelihood that a jury so instructed would be unduly influenced by the mere number of special circumstances, without regard to the character or quality of the conduct on which they were based. Accordingly, defendant's claim is lacking in merit.

### G. Constitutionality of Death Penalty Law

Defendant contends that various features of California's capital sentencing scheme violate the federal Constitution. As defendant acknowledges, we have previously rejected these challenges. "Thus, we have held: The special circumstances listed in section 190.2 adequately narrow the class of murders for which the death penalty may be imposed (*People v. Kipp, supra,* 26 Cal.4th at p. 1136); section 190.3, factor (a), permitting the jury to consider the circumstances of the capital crime as an aggravating factor, is not unconstitutionally vague or imprecise (*People v. Kipp, supra,* at p. 1137); written jury findings or unanimity as to aggravating circumstances is not constitutionally required (*People v. Lucero, supra,* 23 Cal.4th at p. 741); intercase proportionality review is not constitutionally required (*ibid.*); the prosecution need not prove aggravating circumstances beyond a reasonable doubt (*People v. Kipp, supra,* at p. 1137); the jury need not find beyond a reasonable doubt that death is the appropriate punishment (*ibid.*); the jury need not be instructed that the prosecution has the burden of proof or that there is a presumption for life (*ibid.*); the jury may consider prior unadjudicated criminal activity under section 190.3, factor (b) (*People v. Kipp, supra,* at p. 1138); jury consideration of a defendant's prior felony convictions under section 190.3, factor (c), does not constitute double jeopardy or violate fundamental fairness (*People v. Lewis, supra,* 25 Cal.4th at pp. 659–661); and the qualifiers 'extreme,' 'substantial,' and 'reasonably' in section 190.3, factors (d), (g), and (f), do not prevent jury consideration of relevant mitigating evidence (*People v. Kipp, supra,* at p. 1138; *People v. Jenkins* [(2000)] 22 Cal.4th 900, 1054–1055 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Stanley* (1995) 10 Cal.4th 764, 842 [42 Cal.Rptr.2d 543, 897 P.2d 481])." (*People v. Bolden, supra,* 29 Cal.4th at pp. 566–567.)

In his reply brief, defendant urges us to reconsider our holdings on these issues in light of the United States Supreme Court's decisions in *Ring v. Arizona, supra,* 536 U.S. 584, and *Apprendi v. New Jersey, supra,* 530 U.S.

466. We have concluded, however, that these decisions "do not affect California's death penalty law." (*People v. Smith, supra,* 30 Cal.4th at p. 642.)

### H. *Cumulative Prejudice*

Defendant argues that even if no single error requires reversal of the penalty verdict of death, the cumulative effect of the errors at the guilt and penalty phases must be deemed sufficiently prejudicial to warrant this remedy. We have found error only in the trial court's penalty phase instructions on defendant's possession of razor blades while in custody, and we have concluded that defendant suffered no resulting prejudice. Because defendant has not demonstrated other errors or defects in the trial proceedings, there is no possibility of cumulative prejudice.

### IV. DISPOSITION

The judgment is affirmed in its entirety.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied July 14, 2004.