Filed 9/17/15  P. v. Snowden CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B259000 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  LA074666) |
| v. | |
| KIOKI SNOWDEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph A. Brandolino, Judge.  Affirmed as modified and remanded with directions.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Kioki Snowden was convicted by a jury of kidnapping, robbery, rape and related offenses.  On appeal, he contends the trial court erred in admitting

portions of his post-arrest interview with detectives in which he referred to his intent to behave like "Ted Bundy" and to being a "cutthroat monster." He further contends that trial counsel's failure to object to the introduction of the "cutthroat monster" portion of the interview represented ineffective assistance of counsel. We find no error on the part of the trial court and no ineffective assistance of counsel.

Appellant and respondent agree that the sentence on count three (robbery) must be stayed under Penal Code section 654, and that the abstract of judgment must be amended to reflect the correct sentence on count two (kidnapping to commit robbery).[1] We agree and accordingly, we modify the judgment and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Information*

Appellant was charged by information with kidnapping to commit rape (count one, § 209, subd. (b)(1)); kidnapping to commit robbery (count two, § 209, subd. (b)(1)); second degree robbery (count three, § 211); forcible rape (count four, § 261, subd. (a)(2)); sexual penetration by a foreign object (count five, § 289, subd., (a)(1)(A)); forcible oral copulation (count six, § 288a, subd. (c)(2)(A)); sodomy by use of force (count seven, § 286, subd. (c)(2)(A)); three counts of forcible rape (counts eight, nine and ten, § 261, subd. (a)(2)); and identity theft (count 11, § 530.5, subd. (a)).[2] It was further alleged in connection with counts one through ten that appellant personally used a deadly weapon, a knife, within the meaning of section 12022, subdivision (b)(1). With respect to counts four through ten, it was alleged that appellant used a deadly weapon within the meaning of

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     Count 12, a second count of identity theft, was dismissed by the prosecution before the case went to the jury.

section 12022.3, subd. (a), that the kidnapping and movement of the victim substantially increased the risk of harm (§ 667.61, subds. (a) and (d), and that appellant tied or bound the victim (§ 667.61, subds. (a) and (e).)

B. *Evidence at Trial*

According to the testimony of the victim, Lauren R., she left work at 5 p.m. on July 4, 2013. She was in her car in the parking lot of the Topanga Mall when appellant approached with a three-inch knife. Appellant said: "'Do exactly as I say, and you won't get hurt'" and "'don't try to put up a fight.'" Fearing that appellant would hurt her, Lauren decided to cooperate with him and do everything he told her to do. Once appellant was in the passenger seat, he took Lauren's bank card and $50 in cash. He then instructed her to drive to an area where he could find "nicer homes to rob." They stopped to refuel at a station in Pasadena, where appellant took the keys and tied Lauren's hands to the steering wheel while he pumped gas. They next drove to a residential neighborhood, where appellant ordered Lauren into the back seat, tied her hands behind her back, and placed a blanket over her. Appellant drove to a parking lot and stopped the car. Lauren said: "Please, don't hurt me." Appellant responded: "I'm not going to hurt you, I'm going to fuck you."

Appellant commenced a lengthy sexual assault of Lauren. Lauren testified that he fondled and put his mouth on her breasts. He penetrated her vagina with his fingers. He put his penis in her vagina and rectum, and instructed her to orally copulate him when he lost his erection. He paused and changed positions several times before ejaculating. Her hands were tied during the initial portion of the

assault.[3]  Afterward, appellant instructed Lauren to get dressed and drive to a nearby ATM.  Afraid he would be unsatisfied with the amount of money in her checking account, Lauren used her cell phone to transfer $1,000 from her savings account.  Appellant withdrew money from her account using her ATM card and instructed her to drive him to Union Station.  Before leaving her in the car, appellant tied Lauren's hands behind her back.

Lauren was able to untie her hands.  In a state of shock from her ordeal, she did not immediately contact authorities, but drove around trying to orient herself.  At approximately 8:00 p.m., she arrived at a party and met up with friends, who observed her "bawling hysterically."  Her friends called 911 and waited with her while police and an ambulance arrived.  A forensic examination revealed bruising on her upper arms and thighs, red marks around one of her wrists, and redness and swelling around her vagina.  The bodysuit she was wearing was ripped.

Appellant's fingerprints were found in Lauren's car.  DNA found in swabs of seminal fluid taken from the car and from Lauren during the forensic exam matched appellant's DNA.  Video from the security camera at the gas station showed appellant entering the cashier's booth at 6:47 p.m. on July 4, and leaving to pump gas.  Videos from Union Station showed Lauren's vehicle entering the parking lot and appellant getting out and walking into the lobby.

After his arrest, appellant was interviewed by two detectives.  In a tape of the interview played for the jury, appellant stated he had been waiting in the mall parking lot for someone to rob when he spotted Lauren.  He said he got into her car planning to rob her, but also said he did not have a plan and had her drive around while he formulated one.  When he first got into the car, he brandished a weapon --

---

[3]     Appellant untied Lauren prior to instructing her to orally copulate him.  In addition, he took off his shirt during the assault at her request and she observed multiple tattoos she was latter able to describe to investigators.

a nail file, which he assumed she thought was a knife. Lauren said: "I don't want you to hurt me. I don't want to get hurt." Appellant said if she did whatever he told her to do she would not get hurt, and told her to "start driving." While they drove around, he could tell that she was "real scared." Appellant admitted tying her hands to the steering wheel when they stopped for gas, and tying her wrists and placing her in the back seat before driving her to the parking lot where, after telling her "I'm going to . . . eff you," he penetrated her in several positions and had her orally copulate him. He admitted touching her breasts and putting his penis in her vagina. He denied sodomizing her. He claimed that she asked to be untied prior to engaging in sexual activity so she could "enjoy" it, and that she was compliant during the sexual assault. However, he also stated that just prior to the assault, she said: "You're not going to hurt me, right?" and that when they arrived at the lot, he had been thinking of "hurting her real bad." He admitted leaving her tied up in the car when he left it near Union Station. He admitted using her bank card to get money from her account July 4 and the next day. He said he took $25 from her wallet when he first got in the car, and a small bag of change when he left.

The defense presented no evidence.

C. *Verdict and Sentence*

The jury found appellant guilty on counts two (kidnapping to commit robbery), three (second degree robbery), four (forcible rape), five (sexual penetration), six (forcible oral copulation), and 11 (identity theft). The jury found appellant not guilty on count seven (forcible sodomy) and counts eight, nine and ten (forcible rape). As to count one (kidnapping to commit rape), the jury found appellant guilty of the lesser included offense of kidnapping (§ 207, subd. (a)). It found the allegation of use of a knife true as to counts one, two and three. It found

5

the movement of the victim allegation true with respect to count four, and found the tying or binding allegation true with respect to counts four and five.

The court sentenced appellant to a term of 84 years to life, consisting of: on count one, the upper term of eight years, plus one year for the weapon allegation; on count two, seven years to life, plus one year for the section 12022, subdivision (b)(1) enhancement; on count three, one year (one-third the middle term), plus four months for the section 12022, subdivision (b)(1) enhancement; on count four, 25 years to life; on count five, 25 years to life; on count six, 15 years to life; and on count 11, eight months (one-third the middle term). The court also imposed various fines and assessments. This appeal followed.

## DISCUSSION

A. *Appellant's Interview*

1. *Background*

In a portion of the interview played for the jury, the detectives asked appellant why he had stayed in the car with Lauren for so long if he intended only to rob her, and whether he had started to "like" her because she was being "friendly" and "nice." This exchange followed: Appellant: "No. I didn't like her. I was -- at first, I was like -- I was going to do some like Ted Bundy shit, but --." Detective: "What's that?" Appellant: "Ted Bundy? You know who Ted Bundy is?" Both detectives: "Yeah. . . . Yeah." Appellant: "The murder-rapist guy." Detective: "Uh-huh." Appellant: "Yeah. I was going to do some stuff like that, but I changed my mind." Detective: "What made you change your mind?" Appellant: "Because she was helping me." A short time later, the detectives asked appellant what he had been planning to do when they arrived at the parking lot where the sexual assault took place, referencing appellant's prior mention of Ted

6

Bundy. Appellant replied: "Yeah. Ted Bundy. He's a rapist and a killer. [¶] . . . [¶] . . . So I would probably [have] raped her and killed her."

The detectives later asked appellant about his tattoos. He said they were "street tattoos," and that one with the lettering "CTM" had just been done. Appellant explained it stood for "[c]utthroat monster." Asked whether that was a name he used, appellant replied: "No. That's just, like me. I'm a cutthroat monster. I'm a monster. It's a monster in my brain, like -- and he just attacks. He doesn't give a fuck, you know. That's why I got the two middle fingers [referring to another tattoo]. [¶] . . . [¶] and cutthroat." The detective asked if the tattoos were associated with a gang. Appellant said: "No. I would never -- I would never be in a gang."

During pretrial proceedings, defense counsel made a general objection to introduction of the taped interview, but the sole specific discussion at that time was to statements -- redacted by the prosecution -- concerning appellant's prior record. Later, counsel specifically objected under Evidence Code section 352 to playing any portion of the interview containing a reference to Ted Bundy. The prosecutor argued that inclusion of these portions of the interview was necessary to establish appellant's intent prior to and during the kidnapping, to establish that he intended to do more than rob the victim and that he had formed an intent to commit rape prior to arriving at the parking lot. The court found the evidence admissible, stating: "It seems to me to be relevant. . . . [to] the defendant's intent, which the People have to prove -- and it may also be relevant to an argument, which, again, the People have the burden of proving, . . . the fear of the defendant's actions and the fear that it may have instilled in the victim, and, obviously, there's going to be some . . . possible defense arguments that the victim was compliant and wasn't in fear. And so, clearly, the defendant is admitting that his intention was to do, as you're saying, 'some Ted Bundy shit,' and that seems to me to be highly relevant,

7

as well, to an argument that he acted, . . . with that intent when he was dealing with the victim. [¶] So I think it's highly relevant for the reason the People mentioned and for the reasons I've indicated, so I will allow it. To the extent that there's anything unduly prejudicial about it, it comes out of his own mouth. It's related to his intent of what he was doing with the victim. [¶] . . . [I]t survives a 352 analysis."

Prior to opening statements, defense counsel learned that the prosecutor planned to put up a slide that said "'statement of defendant AKA cutthroat monster'" and to play portions of his interview. She objected under Evidence Code section 352 to "the use of the word 'cutthroat monster' in opening," and to allowing the prosecutor to utilize portions of the interview that were "favorable to the prosecution." The court overruled the objections, finding appellant's comments about the tattoo "highly relevant" because they were made during his discussion of the crime with the detectives and gave "an impression as to why he did what he did and the fact that he did it."

During closing argument, the prosecutor contended that Lauren's actions in complying with appellant's instructions "saved her life" and "kept her from being, in the defendant's words, 'Ted Bundy'd.'" He further stated: "Somehow she knew the person that was in front of her was really dangerous, that this person in front of her proudly calls himself 'the cutthroat monster.' So she did everything he said. Everything he wanted, she did, because she wanted to survive. . . to see the sunrise on July 5th." When addressing the evidence to support count one (kidnapping to commit rape), the prosecutor further stated: "[L]et's assume, for argument's sake . . . that he didn't have the intent to rape her when he got in the car. . . . He tells her to get on the freeway, directs her. . . . They end up in Pasadena; according to his own statement, [he] was going to Ted Bundy her at that

parking lot." The prosecutor argued that at that point, appellant's intent was to "rape and kill."

Defense counsel argued that the evidence had not established appellant had a specific intent to rape or rob the victim when he committed the kidnapping. She further argued that Lauren's physical symptoms were consistent with both rape and consensual sex, and that Lauren's decision to cooperate with appellant, her failure to attempt to escape or to draw attention to her predicament, and her request that appellant untie her and take his shirt off during the assault could reasonably have been construed as consent to the sexual activities. In rebuttal, to refute the defense's argument that appellant could have believed Lauren was consenting to the sexual acts, the prosecutor reminded the jury of the "circumstantial evidence" of appellant's "thoughts . . . before, during, and after the sex acts": "Before, on the way to Pasadena, he says, 'that's when I was going to Ted Bundy her.'"

### 2. *Analysis*

Appellant contends the court erred in refusing to exclude, under Evidence Code section 352, the references to "Ted Bundy" and "cutthroat monster" from the portions of the interview played to the jury. We find no error.

Trial courts have broad discretion in determining the admissibility of evidence, particularly when objection is made under Evidence Code section 352. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1170; *People v. Jones* (2013) 57 Cal.4th 899, 949.) The court's exercise of discretion will not be disturbed except on a showing that it was exercised "'in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) "We do not reverse a judgment for erroneous admission of evidence unless 'the admitted evidence should have been excluded on the ground stated and . . . the error or errors complained of resulted in a

9

miscarriage of justice.'" (*People v. Earp* (1999) 20 Cal.4th 826, 878, quoting Evid. Code, § 353, subd. (b).)

A section 352 objection will fail "'"[u]nless the dangers of undue prejudice, confusion, or time consumption, '"substantially"' outweigh the probative value of relevant evidence . . . ."'" (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) The prejudice contemplated by Evidence Code section 352 "'"is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of undue prejudice."'" (*Doolin, supra,* 45 Cal.4th at pp. 438-439, italics deleted.) Unduly prejudicial evidence consists of "'"evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'" (*Id*. at p. 439.) "'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'" (*Ibid*.)

Here, appellant was charged with kidnapping to commit rape. The evidence on this point was conflicting. Appellant stated during the interview that his initial intent had been only to rob Lauren, that he had no plan, and that he instructed her to drive around until he could formulate one. Appellant's reference to his intention to "do some like Ted Bundy shit," supported the prosecution's theory that appellant formed the intent at an early point in the kidnapping to rape his victim. The references to Ted Bundy along with his description of himself as a "cutthroat

10

monster" who "just attacks" and "doesn't give a fuck," also supported the inference that he conveyed an air of threat and menace, which explained Lauren's reluctance to attempt to escape, and her seeming compliance with some of the sexual activities forced upon her. Appellant's contention that the evidence was "cumulative" is contradicted by the fact that the jury was not convinced, even after hearing this evidence, that appellant intended to commit rape when he drove Lauren to the parking lot where the sexual assault took place. His claim that the jurors were unduly prejudiced by this evidence is disproven by their verdict: they found him not guilty of three counts of rape and one count of sodomy, as well as the charge of kidnapping to commit rape -- and found several of the enhancements not true. In view of the relevance of the evidence and the absence of anything in the record to support that it inflamed the jury or led it to resolve the issues based on bias and emotion, we find no error in the trial court's ruling.

Moreover, even had we found error, we would deem it harmless. Lauren testified that appellant kidnapped her at knifepoint, forced her to drive around for hours while she pleaded with him not to hurt her, tied her up three times, drove her to a parking lot and sexually assaulted her. Her testimony was corroborated by fingerprint evidence, DNA evidence, multiple surveillance videos and medical evidence of the assault. Appellant admitted in a recorded statement that he lay in wait for an appropriate victim to rob, that he immediately threatened Lauren with a weapon and told her to do as instructed or she would get hurt, that he knew she was "real scared," and that when asked if he was going to hurt her, he responded that he was "going to . . . eff [her]." He admitted tying her up, penetrating her in multiple positions, and directing her to orally copulate him. He admitted that he considered "hurting her real bad" prior to taking her bank card and money from her account. The evidence that appellant kidnapped and robbed Lauren was effectively uncontested, and the evidence he sexually assaulted her was

11

overwhelming.  In short, there was no reasonable chance that the verdicts would have been different had the "Ted Bundy" and "cutthroat monster" portions of the interview not been introduced.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)


B.  *Competency of Trial Counsel*

Defense counsel objected only to the prosecution's use in opening statement of the term "cutthroat monster" and to playing parts of the interview out of context. Counsel did not object to having the jury hear the portion of the interview tape in which appellant discussed his "CTM" and other tattoos, either during pretrial proceedings or when the interview was introduced.  Accordingly, any contention on appeal with respect to the admission of that portion of the interview tape was forfeited.  (See *People v. Hinton* (2006) 37 Cal.4th 839, 893, fn. 19.)

Appellant contends that the failure to object to the admission of that portion of the tape rendered trial counsel's representation inadequate.  In order to establish ineffective assistance of counsel sufficient to overturn a conviction, a defendant must show:  "(1) deficient performance under an objective standard of professional reasonableness and (2) prejudice under a test of reasonable probability of an adverse effect on the outcome.  [Citation.]"  (*People v. Berryman* (1993) 6 Cal.4th 1048, 1081, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800.) "Failure to object rarely constitutes constitutionally ineffective legal representation."  (*People v. Abilez* (2007) 41 Cal.4th 472, 493, fn. 3.)  "To prevail [on a claim of ineffective assistance of counsel], defendant must overcome the strong presumption that counsel's actions were sound trial strategy under the circumstances prevailing at trial.  [Citations.]"  (*People v. Freeman* (1994) 8 Cal.4th 450, 498.)  "'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed

12

to provide one, or there simply could be no satisfactory explanation. [Citation.]' [Citation.]" (*People v. Abilez*, *supra*, 41 Cal.4th at p. 493.)

To support Lauren's identification of appellant as her assailant, the prosecution introduced evidence of appellant's multiple tattoos, which Lauren saw when he removed his shirt during the sexual assault. When asked about his tattoos during the interview, appellant denied that they were gang related, stating that he was not and never would be a gang member. In light of the obvious relevance and admissibility of the tattoos, defense counsel could have concluded that appellant's discussion of them would dispel any inference of gang membership the jury might otherwise draw. We need not speculate, however, as to defense counsel's strategy. We conclude that in light of appellant's specific admissions during the interview and the overwhelming evidence of his guilt on the charges of which he was convicted, any reference to the meaning behind his tattoos did not affect the verdicts. Appellant's trial counsel successfully persuaded the jury to find him guilty of the lesser included offense on the most hotly contested count (count one: kidnapping with intent to rape) and to return not guilty verdicts on four other counts. We perceive no basis for second-guessing her tactics or concluding that a better outcome would have been achieved had they been different.

C. *Sentence on Count Three*

In closing argument, the prosecutor informed the jury that the robbery charged in count three occurred shortly after appellant got into the car -- when he took Lauren's bank card and cash -- and was completed as soon as he moved her a substantial distance from the mall parking lot. The court sentenced appellant on count two (kidnapping to commit robbery) to seven years to life, plus one year for the section 12022, subdivision (b)(1) enhancement. It imposed a consecutive sentence of a year and four months on the count three robbery. When a kidnapping

13

for robbery and a robbery are committed pursuant to a single intent or objective, as when a defendant kidnaps the victim in order to rob him or her and immediately carries out that objective, section 654 precludes punishment for both. (*People v. Lewis* (2008) 43 Cal.4th 415, 519, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912; *People v. Beamon* (1973) 8 Cal.3d 625, 639-640, disapproved on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896.) The parties agree that the robbery charged in count three and the kidnapping to commit robbery in count two were committed pursuant to a single intent or objective. Accordingly, the sentence must be modified to reflect that the robbery conviction in count three is stayed, and the abstract of judgment must be amended accordingly.

D. *Abstract of Judgment*

As stated above, appellant was sentenced to seven years to life on count two (kidnapping to commit robbery), plus one year for the enhancement under section 12022, subdivision (b)(1). The abstract of judgment erroneously states that appellant was sentenced to "8 years to life" on count two and must serve an additional "1 yr" for the enhancement. The parties agree the abstract of judgment must be amended to reflect the correct sentence.

**DISPOSITION**

The judgment is modified to reflect that the sentence for the robbery conviction in count three is stayed.  In all other respects, the judgment is affirmed.  The superior court is directed to prepare an amended abstract of judgment reflecting this change and further reflecting that the sentence for kidnapping with intent to commit robbery in count two is seven years to life with an additional one year for the enhancement.  When completed, the amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

15