Filed 1/25/22  P. v. Tevaseu CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>LOGOLOGOA TEVASEU,<br><br>       Defendant and Appellant. | A158436<br><br>(Sonoma County<br>Super. Ct. No. SCR-709679) |

Defendant Logologoa Tevaseu drove at high speed on the wrong side of a highway while intoxicated.  He crashed head-on into a car coming in the opposite direction, killing the driver and causing three additional vehicles to collide.  A jury found him guilty of second-degree murder, gross vehicular manslaughter while intoxicated, and two other counts relating to driving while intoxicated.

On appeal, defendant contends that the jury was improperly instructed on the meaning of "conscious disregard" in the context of implied malice murder and that the trial court abused its discretion in admitting crime scene photos and cumulative evidence of a prior conviction for driving under the influence.  We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

About 9:00 on the evening of November 5, 2017, defendant drove a full-sized pickup truck southbound on the two-lane Lakeville Highway in Sonoma

County, on a stretch that had a double yellow line between the lanes of traffic going in opposite directions. Traffic was moving at about 50 or 60 miles per hour, and there were cars coming in both directions. A motorist travelling in the southbound direction at the same speed as the rest of the traffic saw a pickup truck approach her car quickly from behind, cross into the northbound lane to pass her, and return quickly to the southbound lane, cutting her off and startling her. The motorist slowed down and saw the truck accelerate toward the vehicles in front of it, cross the double yellow lines to move back into the northbound lane, and hit a car heading north, causing a violent collision "like a big explosion" that sounded "like a bomb went off." The car came to a stop straddling the yellow lines, heavily damaged, and the truck spun and veered to the right off the roadway. Three additional vehicles crashed into the car in rapid succession.

The driver of the car that defendant's truck hit head-on was Paulette Quiba, a 21-year-old college student returning from dinner with her family. She died immediately from the impact of the collision. An autopsy revealed that she suffered multiple blunt force injuries, broken bones, injuries to internal organs, lacerations including one on the head that exposed the skull, fractures and hemorrhage in the head, and significant brain injuries. There was no evidence of intoxication.

Five occupants of the other three vehicles involved in the collisions were injured. Four of them were transported to hospitals by ambulance that night and one sought medical attention the next day.

Defendant did not suffer serious injuries. He called 911 before highway patrol officers arrived and reported that someone had swerved out on the road, tried to get around a car, and hit him head-on. An officer spoke to defendant, and defendant again said someone had come into his lane and hit

2

him.  The officer smelled alcohol and thought defendant's speech pattern was "off."  The officer asked what defendant had been drinking that night, and defendant replied, "Nothing."  The officer carried out field sobriety tests, determined defendant was under the influence, and arrested him for driving while intoxicated.

A blood test performed at 11:41 p.m. revealed a blood alcohol level of .174 percent, more than twice the legal driving limit of .08 percent.  Assuming defendant consumed his alcohol much earlier in the day, his blood alcohol level at the time of the accident, more than two and a half hours before the blood draw, would have been approximately .22 percent.  At 1:00 in the afternoon that day, it would have been .366 percent, and .42 percent at 10:00 in the morning.  It would take a man of defendant's size about 10.8 standard drinks (or 13.5 ounces of 80 proof liquor) to reach a blood alcohol level of .174 percent, 13.8 drinks (or 17.25 ounces of liquor) to reach .22 percent, 22 and a half drinks (or 28 ounces of liquor) to reach a level of .36 percent, and 26 and a quarter drinks (or 32 ounces of liquor) to reach a level of .42 percent.

Defendant told police officers later that he had "a little tequila" the previous night at a family gathering, then changed his response to say he had "maybe eight to ten" shots, some of them doubles, and had been drinking until 6:00 in the morning or later.  He went to sleep around 9:00 or 10:00 in the morning and slept until 1:00 in the afternoon.  At the time of the accident, he was returning home after driving his daughter from his home in Santa Rosa to her mother's house in Pleasant Hill.

The jury heard evidence that defendant was previously convicted of driving under the influence of alcohol and attended a drunk driving

prevention program.  We will discuss the evidence regarding that conviction in greater detail below.

The theory of the defense was that defendant did not realize he was intoxicated because he had developed a tolerance to alcohol, and therefore he did not act with implied malice—conscious disregard for life—so as to be guilty of second degree murder.  In support of this theory, he called as a witness his sister-in-law, who testified that defendant had two or three shots of tequila on the evening before the accident, then went to bed in the home where he lived with her and her husband.  The next morning, defendant took his two children and two other children to an outing, returning about 4:30 or 5:00 that afternoon, and then to a park, returning around 5:30 p.m.  Around 6:00, defendant left the house to take his daughter to her mother's house.  Defendant did not show signs of alcohol impairment that day.  There was also testimony from a friend of defendant's who played basketball with him for several hours on Sunday afternoon, another friend with whom defendant spoke on the telephone that evening,  and the mother of defendant's daughter who saw him when he brought the child back to her home about 7:45 the evening of the accident, all of whom said he did not appear impaired.

Defendant introduced expert evidence that he had an acquired tolerance to alcohol, leading to a lower awareness of impairment, and that someone with his background who engaged in his activities on the day of the accident without showing signs of intoxication likely would not have known he was impaired that evening.

A jury found defendant guilty of second degree murder (Pen. Code, § 187, subd. (a); count 1), gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a); count 2); driving under the influence causing injury (Veh. Code, § 25153, subd. (a); count 3),  and driving with a blood

4

alcohol concentration of 0.08 percent or more and causing injury (Veh. Code, § 23153, subd. (b); count 4), and found true a variety of enhancement allegations. The trial court sentenced defendant to a prison term of 15 years to life for count 1, a consecutive term of three years for count 4, with sentence for the remaining counts and the enhancements stayed or stricken, for a total term of 18 years to life. This timely appeal ensued.

## DISCUSSION

### I. Instruction on Conscious Disregard for Human Life

When giving instructions on the mental state required for second degree murder under a theory of implied malice, the trial court informed the jury that defendant acted with implied malice if he intentionally committed an act the natural and probable consequences of which were dangerous to human life, that he knew his act was dangerous to human life, and that "he deliberately acted with conscious disregard for human life." (CALCRIM No. 520.)

During its deliberations, the jury asked the trial court, "Is there a legal definition of 'conscious disregard' or do we use [the] common meaning of [the] phrase?" With the agreement of both counsel, the court answered, "There is no legal definition of conscious disregard. Please use the common meaning of the phrase."

Defendant contends that this response to the jury's inquiry was improper, that it prejudiced him because the jury might have convicted him without knowing the prosecution was required to prove he deliberately drove knowing he was dangerously intoxicated, and that his counsel rendered ineffective assistance in agreeing to it. Because he did not object to the trial court's response to the jury's question—and indeed, he agreed to it—he has

5

forfeited the issue. (*People v. Davis* (2009) 46 Cal.4th 539, 616–617; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193.)

In any case, defendant's contention lacks merit. If a deliberating jury wishes "to be informed on any point of law arising in the case," the court must provide the information. (Pen. Code, § 1138.) But this rule "does not mean that the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) We review for abuse of discretion the trial court's decision to instruct, or not to instruct, in response to a jury's question. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1032.) Even if the court violates Penal Code section 1138, reversal requires a showing of prejudice. (*Beardslee*, at p. 97.)

There was no reversible abuse of discretion here. "When a term is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, an instruction as to its meaning is not required in the absence of a request." (*People v. Williams* (1988) 45 Cal.3d 1268, 1314–1315; accord, *People v. Estrada* (1995) 11 Cal.4th 568, 574.) A word or phrase with a technical, legal meaning requires clarification if that definition differs from the nonlegal meaning. (*Estrada*, at p. 574.) Even in the face of a jury request for a legal definition, the trial court need not provide one if "there is no *legal* definition of the term." (*People v. Raley* (1992) 2 Cal.4th 870, 901.) In such a case, "[t]he jurors' common understanding of the term [is] all that [is] required," and " '[t]here is no need to instruct a jury on the meaning of terms in common usage, which are

6

presumed to be within the understanding of persons of ordinary intelligence.' " (*Ibid.*)

Here, the jury did not ask the court what "conscious disregard" meant. Rather, its question indicated it *understood* the common meaning of the phrase and wondered whether it was appropriate to apply it. Defendant has not shown the term has a technical legal meaning that differs from the common meaning of the phrase and required further definition for the jury to understand it.

Against this conclusion, defendant contends the meaning of the term "conscious disregard" is unclear and requires explication. For this argument, he points to *People v. Chun* (2009) 45 Cal.4th 1172, but that case in inapposite. In *Chun*, our high court explained that the statutory definition of implied malice—" 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart' "—is "quite vague" and "permits, even requires, judicial interpretation." (*Id.* at p. 1181, citing Pen. Code, § 188, subd. (a)(2).) But *Chun* does not suggest that the term at issue here—" ' "conscious disregard for life" ' "—is similarly vague. Rather, the court explained that the term " ' "conscious disregard for life" ' " provides the interpretation that the statutory language (" 'abandoned and malignant heart' ") requires. (*Chun*, at pp. 1181, 1184.) Elsewhere, our high court has emphasized that "juries should be instructed that malice is implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another *and who acts with conscious disregard for life*' "—almost precisely as the jury was here. (*People v. Blakeley* (2000) 23 Cal.4th 82, 87, italics added, quoting *People v. Dellinger* (1989) 49 Cal.3d

1212, 1215.) This language, reflected in CALCRIM No. 520, is "straightforward" and " 'more comprehensible to the average juror' " than alternative formulations that have been used. (*Dellinger*, at pp. 1221–1222; *People v. Knoller* (2007) 41 Cal.4th 139, 152.)

For his argument that "conscious disregard" has a legal definition different from its common meaning, defendant also points to authorities that explain the meaning of the phrase. For instance, the court in *People v. Olivas* (1985) 172 Cal.App.3d 984, 987–988 said that, "[p]hrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " And certain pattern instructions in civil cases explain the meaning of "conscious disregard" and similar terms; for instance, 2 CACI 3944, given when assessing punitive damages against an employer, states, "A person acts with knowing disregard when the person is aware of the probable dangerous consequences of the person's conduct and deliberately fails to avoid those consequences." (Accord, BAJI 7.47.) But these authorities do not suggest the instruction on implied malice requires further explanation for a jury to understand its meaning.

Defendant has not shown that the instruction the court provided was insufficient to inform the jury of the applicable legal principles or that the jury did not understand the common meaning of "conscious disregard."

## II. Evidence of Prior Conviction and Sentence

Before trial, the People sought to admit evidence of defendant's driving history, including his plea of no contest to driving under the influence of alcohol in 2011 and completion of a court-ordered treatment program (the 2011 incident), contending the evidence was relevant to prove implied malice. The trial court allowed the jury to hear some, but not all, of the evidence the

People proffered, explaining as it did so that there could be "some truncated presentation of evidence related to the facts and circumstances," but not "a detailed trial within a trial."

The jury heard evidence that defendant was involved in an accident in Santa Rosa in October 2011. A witness, Joshua Green, testified that he was outside in an area that had a "big bar scene," heard a crash, turned, and saw a car "scrape off a truck and slowly veer left across the street," going through four lanes of traffic and coming to a stop across the street. The car was "[p]retty banged up," and Green thought someone might be injured. The sole occupant of the car, defendant, seemed "out of it, dazed," and "not too great."

A police officer who came to the scene saw that the rear of the truck that had been hit was damaged and the truck had been pushed partially onto the sidewalk and into a street sign, which had collapsed. Defendant's car had suffered extensive damage, the windshield was shattered, and the airbags had been deployed. The jury viewed pictures of the accident scene and defendant's damaged vehicle. Defendant was taken to a hospital by ambulance. The officer went to the hospital, saw defendant, and concluded he was under the influence of alcohol.

In February 2012, defendant pled no contest to misdemeanor driving with a blood alcohol level of .08 percent or more (Veh. Code, § 23152, subd. (b)) and admitted an enhancement that his blood alcohol level had been greater than .15 percent (Veh. Code, § 23578). He put his initials in a box on the plea form indicating he understood that being under influence of alcohol impaired his ability to drive, that it was extremely dangerous to human life to drive under the influence, and that if he continued to drive under the influence and killed someone, he could be charged with murder. As part of his probation, he attended a drunk driving prevention program. His license

was suspended for several months as a result of the incident. His records from the Department of Motor Vehicles were admitted into evidence, as were a redacted complaint and redacted docket in the 2011 case.

Stacy Jonas, who works with Sonoma County's three-month driving under the influence program, testified that the purpose of the program is to educate people who have already suffered convictions. Students are taught about blood alcohol concentrations, how alcohol is absorbed by the body, the rate at which the body can process and remove alcohol, the dangers of drinking and driving, and risks of fatal collisions when driving with high blood alcohol levels. Throughout the classes, students are taught about tolerance to alcohol, that is, that a person who has developed tolerance may feel fine subjectively but still have a high blood alcohol level and impaired driving. Defendant attended a first offender program in 2012.

The trial court instructed the jury that evidence related to the 2011 incident was relevant only for the specific purpose of demonstrating that defendant had knowledge of the dangers of drinking and driving, and that it should not be considered for any other purpose. The court reiterated at least five times that the evidence of the 2011 offense was admitted only for the limited purpose of showing whether defendant had subjective knowledge that his actions were dangerous to human life and deliberately acted in conscious disregard of the danger to human life.

In both his opening statement and his closing argument, the prosecutor pointed to the 2011 incident to argue that defendant knew the dangers of driving under the influence because he had caused a major crash under the influence of alcohol, was injured, suffered penal consequences, and was educated about the dangers of combining alcohol and driving.

10

Defendant acknowledges that his prior drunk driving conviction, the fact that it involved a collision, and his completion of the driver safety classes were properly admitted to show he knew of the dangers of driving under the influence of alcohol. (See *People v. Ortiz* (2003) 109 Cal.App.4th 104, 112 (*Ortiz*) [driver's previous encounters with consequences of driving under the influence "sensitize[] him to the dangerousness of such life-threatening conduct"].) He contends, however, that the trial court improperly allowed cumulative evidence that went beyond these relevant facts and that he suffered prejudice thereby. In particular, he argues, there was no reason to allow an eyewitness to the accident to testify about its details, no reason to allow the officer who arrested defendant in 2011 to testify about the damage to the vehicles, and no reason to allow Jonas to provide detail about irrelevant aspects of the program defendant attended, including that some of the programs were for multiple offenders. And, he argues, the jury viewed records that improperly revealed he had committed additional unrelated offenses.

Under Evidence Code section 1101, subdivision (a), evidence of a person's character, including evidence of specific instances of his or her conduct, is inadmissible to prove conduct on a specific occasion. However, that rule does not bar admission of evidence that a person previously committed a crime when relevant to prove some other fact, including the person's knowledge, if the evidence is relevant and not more prejudicial than probative. (Evid. Code, §§ 350, 352, 1101, subd. (b).) Such prejudice exists when evidence "uniquely tends to evoke an emotional bias against defendant as an individual and . . . has very little effect on the issues." (*People v. Brogna* (1988) 202 Cal.App.3d 700, 709–710 (*Brogna*); *People v. Battle* (2021)

11 Cal.5th 749, 799.) We review a trial court's rulings on these questions for abuse of discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

Defendant has not shown an abuse of discretion here. " 'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' " (*People v. Watson* (1981) 30 Cal.3d 290, 300–301.) And evidence that a person was subjectively aware that driving under the influence of alcohol is dangerous may be relevant to show implied malice. (See, e.g., *People v. Wolfe* (2018) 20 Cal.App.5th 673, 682–683.) Particularly pertinent here, "evidence that a defendant has suffered a prior conviction and participated, as a condition of probation, in some form of alcohol education program which emphasized the dangers of driving while intoxicated is relevant to prove the accused's awareness of the life threatening risks caused by his conduct." (*Brogna, supra*, 202 Cal.App.3d at p. 709; see *Ortiz, supra*, 109 Cal.App.4th at pp. 112–115.)

The evidence relating to the 2011 collision was properly admitted. A certain amount of detail about the accident was relevant to show that defendant knew from first-hand experience that an alcohol-fueled crash could cause significant property damage and personal injury. The evidence of the drunk driving program showed he had been taught about the dangers of driving while intoxicated and the difficulty of assessing his own level of impairment. The jury knew the program defendant attended in 2012 was for first-time offenders, and it had no reason to think he had suffered other convictions for driving under the influence. The criminal records were redacted to eliminate references to any other prior convictions. The evidence

12

before the jury was relevant, it was not calculated to cause an emotional bias against defendant that outweighed its probative effect, and the jury was instructed repeatedly to consider it only for a limited and proper purpose. Defendant has not persuaded us the trial court abused its discretion in admitting the evidence.

## III. Photographs of Accident Scene

Defendant's final contention is that the trial court abused its discretion in admitting what he describes as " 'gruesome' " photographs of the crash scene. He argues that since he did not dispute he caused the accident while under the influence of alcohol and the only question was whether he consciously disregarded the threat to human life, there was no need for the People to introduce photographs to illustrate the manner of the crash. Although defendant does not identify the particular photographs he challenges, he appears to refer to two pictures showing Quiba's lifeless body in her car after the accident and several pictures depicting the extensive damage to her car as well as the damage to the other vehicles involved in the accident.

During a discussion with counsel, the trial court examined a number of photographs the People sought to introduce. As to the pictures showing Quiba after her death, two showing Quiba in her car were admitted. The court said it understood the pictures were "terrible," "gruesome," and "inflammatory," but concluded that in a "death case" they were "probative of the issues." The court allowed several photographs from the scene showing the damage to the vehicles, but limited the number of pictures of the damaged vehicles away from the crash scene, in better light, allowing "two or three" of defendant's truck and "three or four" of Quiba's vehicle, which was "completely demolished."

Although admission of "particularly gruesome photographs" may be an abuse of discretion in some circumstances (*People v. Booker* (2011) 51 Cal.4th 141, 170), photographs may properly be used to assist the jury in understanding and evaluating the witnesses' testimony (*People v. Pollock* (2004) 32 Cal.4th 1153, 1170–1171 (*Pollock*)). " 'The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of jurors.' " (*People v. Watson* (2008) 43 Cal.4th 652, 684.) We review for abuse of discretion the admission of such photographs. (*Ibid.*; see Evid. Code, § 352.)

Our high court has explained that " '[p]hotographs of a murder victim "are always relevant to prove how the charged crime occurred, and the prosecution is 'not obliged to prove the details solely from the testimony of live witnesses,' " *even in the absence of a defense challenge to particular aspects of the prosecution's case.*' " (*People v. D'Arcy* (2010) 48 Cal.4th 257, 299, italics added.) In *People v. Lewis* (2001) 25 Cal.4th 610, 641, the defendant made a similar contention to that made here—that victim and crime-scene photographs and videotape were inadmissible because they had no bearing on his mental state, the only disputed issue at trial. The court rejected this contention on the ground that "the absence of a defense challenge to particular aspects of the prosecution's case or its witnesses does not render victim photographs irrelevant." (Accord, *Pollock*, *supra*, 32 Cal.4th at p. 1170.)

With these standards in mind, we have examined the photographs admitted into evidence. The images of Quiba's body still in her car, while undoubtedly distressing, do not show gratuitous detail and serve to illustrate

14

both the testimony about the accident scene and the force of the collision caused by defendant's driving.  (See *Pollack*, *supra*, 32 Cal.4th at pp. 1170–1171.)  Similarly, the images of the damaged vehicles are relevant not only to illustrate the testimony but also to show the great violence of the collision and, by extension, the level of hazardousness of defendant's conduct, a matter that could bear both on his mental state for purposes of second degree murder and on whether he acted with gross negligence for purposes of the gross vehicular manslaughter charge.  (Pen. Code, § 191.5; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1208 [gross negligence may be shown from all relevant circumstances, including manner in which defendant operated vehicle].)  The trial court limited the number of photographs admitted, and they do not appear to be unduly inflammatory.  The court did not abuse its discretion in admitting them.

Defendant makes a cursory challenge to the jury viewing videos of the accident scene, but he does not point to any part of any video that was inadmissible.  In discussing the videotape evidence, the prosecutor said that it demonstrated the position of the vehicles but that it did not dwell enough on any individual vehicle to show the damage, and defendant's counsel did not challenge this characterization.  Defendant has not shown the video evidence was improperly admitted.

## DISPOSITION

The judgment is affirmed.

15

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*People v. Tevaseu* (A158436)

16